Taylor, J.
These consolidated cases arise from the same bank robbery and ensuing police stop of a car in the city of Jackson. In each case, the defendant argues that incriminating evidence resulting from the stop of the car should have been suppressed on the basis of the Fourth Amendment exclusionary rule. We *187 conclude that the stop of the car was supported by reasonable suspicion and, thus, did not violate the Fourth Amendment. Accordingly, we agree with the refusal of the lower courts to suppress the evidence at issue.
I. FACTS AND PROCEDURAL HISTORY
Shortly before noon on December 1, 1994, an armed robbery was committed at a Republic Bank branch in Jackson. It was reported that two black males were the perpetrators and that they left the bank on foot. Pivotal to the issue at hand is the conduct of Jackson County Deputy Sheriff Roger Elder that led to his stopping of the motor vehicle containing both the defendants and two other passengers. Deputy Elder had been a sheriffs deputy for over sixteen years at the time of the suppression hearing in Oliver. Notably, the great bulk of Deputy Elder’s service with the sheriff’s department was with the road patrol division. Before that, he was a township police officer for about two and a half to three years. In the course of his career as a police officer, Deputy Elder was directly involved in investigating about twenty bank robberies.
Deputy Elder testified that while he was in his patrol car shortly before noon on the date of the robbery he (along with other police officers in the area) heard a general dispatch that an armed robbery had just occurred at the Republic Bank at the comer of North and Wisner Streets in Jackson. This dispatch advised that the suspects were two black males last seen heading northbound on foot from the bank. When he heard the dispatch, Deputy Elder, who was north of the bank, headed south to the general area of *188 the bank to look for suspects. Deputy Elder explained at the suppression hearing in Oliver that he was not looking for just two suspects,
[bjecause it’s my experience in the years I’ve been a police officer, that there is almost always a getaway car in a bank robbery, and if there’s a getaway car, there’s at least one more person with it.[1]
In the course of driving toward the area of the armed robbery, Deputy Elder stopped at a New York Carpet World store where he encountered two store employees standing outside smoking cigarettes. This store was located north of the Republic Bank. Deputy Elder asked them if they had seen any black males running in the area, and they replied that they had been outside for about ten minutes and had not seen anyone except children across the street at a school.
He next went to the Westbay Apartments complex because he thought that the apartment complex would have been an excellent place for someone on foot to run and a good place to hide a getaway vehicle. The Westbay Apartments were located on the corner of North and Brown Streets, which was the first major intersection along North Street to the west of the Republic Bank, and this area was secluded. The Westbay Apartments complex was within a quarter mile of the Republic Bank.
When Deputy Elder was turning into an entrance to the Westbay Apartments complex, he saw a green *189 Mercedes with four black male occupants heading out of the driveway. Deputy Elder testified at the suppression hearing in Oliver that “[a]s I was passing by them [the occupants of the Mercedes], I turned and looked over at them, and all four subjects looked directly ahead. They would not, any of them, look over at me.” Deputy Elder said that he found this “very unusual” because, on the basis of his nineteen years of experience as a police officer, “[w]ell basically, because people always look at the cops. When you drive by, they always look over and see who’s in the car or — they just always look at you.”[2] Deputy Elder testified that he saw the Mercedes within ten or fifteen minutes of the dispatch regarding the bank robbery and that he passed within six to eight feet of the Mercedes when they passed by each other at the entrance to the apartment complex.
After this, apparently concluding that these individuals were possibly implicated in the robbery, Deputy Elder requested backup over his police radio because he had spotted a “possible suspect vehicle.” Deputy Elder, driving his patrol car, then followed the Mercedes as it proceeded west on North Street, then south on Brown Street, then east on Ganson Street, and finally south on Wisner Street. In driving this route, the Mercedes went through the intersection of Wisner and Ganson Streets. It would have been a more direct route to that intersection from the Westbay Apart *190 ments for the Mercedes to have simply gone east on North Street and then turned south on Wisner Street. Notably, this more direct route would have taken the Mercedes by the location of the Republic Bank that was robbed in this case. When backup patrol cars arrived, Deputy Elder stopped the Mercedes on Wis-ner Street.
Eventually, when another sheriff’s deputy patted down Casual Banks, one of the passengers in the Mercedes, he found a large amount of money, including a bundle of money with a bank wrapper on it, and a Michigan identification for defendant Oliver. Later at the police station, a wad of money was found on defendant Oliver, who was a passenger in the Mercedes. Defendant Taylor was the driver and owner of the Mercedes. A search of the trunk of the Mercedes at the police station located a bag containing money and a .32 caliber automatic pistol. Also, defendant Taylor eventually made statements to the police that were later used against him.
Notably, at each suppression hearing, the trial court credited Deputy Elder’s testimony about the basic facts surrounding the traffic stop. Defendants do not challenge that determination, but rather accept the basic facts related by Deputy Elder, while arguing that he nevertheless did not have legal justification consistent with the Fourth Amendment to effect the traffic stop.
In each of these consolidated cases, the circuit court denied the respective defendant’s motions to suppress the incriminating evidence discussed above. The circuit court held, contrary to the defense position, that the traffic stop was supported by reasonable suspicion.
*191 Thereafter, defendant Oliver entered a conditional guilty plea to conspiracy to commit armed robbery, MCL 750.157a, armed robbeiy, MCL 750.529, and possession of a firearm during the commission of a felony, MCL 750.227b. The condition was that defendant Oliver be able to appeal the trial court’s ruling at the suppression hearing in his case. At a jury trial, defendant Taylor was found guilty of the same crimes to which defendant Oliver conditionally pleaded guilty.
In Oliver, the Court of Appeals declined to address whether there was reasonable suspicion to effect the traffic stop on the basis of its conclusion that defendant Oliver, as a passenger in the car, did not have “standing to challenge” admission of the evidence at issue under the Fourth Amendment exclusionary rule.[3] In Taylor, a different panel of the Court of Appeals agreed with the trial court’s conclusion that the stop of the car was a valid traffic stop supported by reasonable suspicion.
n. analysis
A trial court’s factual findings at a suppression hearing will not be reversed unless they are clearly erroneous. However, as in the present case, the application of constitutional standards regarding searches *192 and seizures to essentially uncontested facts is not entitled to this level of deference. People v LoCicero (After Remand), 453 Mich 496, 500-501; 556 NW2d 498 (1996).
In LoCicero, supra at 501-502, this Court summarized the requirements for the police to make a valid investigatory stop based on reasonable suspicion consistently with constitutional protections:
The brief detention of a person following an investigatory stop is considered a reasonable seizure if the officer has a “reasonably articulable suspicion” that the person is engaging in criminal activity. The reasonableness of an officer’s suspicion is determined case by case on the basis of the totality of all the facts and circumstances. “[I]n determining whether the officer acted reasonably in such circumstances, due weight must be given, not to his inchoate and unpar-ticularized suspicion or ‘hunch,’ but to the specific reasonable inferences which he is entitled to draw from the facts in light of his experience.”
Although this Court has indicated that fewer facts are needed to establish reasonable suspicion when a person is in a moving vehicle than in a house, some minimum threshold of reasonable suspicion must be established to justify an investigatory stop whether a person is in a vehicle or on the street. [Citations omitted.]
Further, in determining whether the totality of the circumstances provide reasonable suspicion to support an investigatory stop, those circumstances must be viewed “as understood and interpreted by law enforcement officers, not legal scholars . . . .” People v Nelson, 443 Mich 626, 632; 505 NW2d 266 (1993). Also, “[c]ommon sense and everyday life experiences predominate over uncompromising standards.” Id. at 635-636.
*193 In Terry v Ohio, 392 US 1, 30-31; 88 S Ct 1868; 20 L Ed 2d 889 (1968), the United States Supreme Court held that in certain circumstances a police officer may “stop” and briefly detain a person consistently with the Fourth Amendment on the basis of reasonable suspicion that criminal activity may be afoot. Notably, “[t]he type of intrusion authorized by [Terry] has been extended to permit investigative stops under various circumstances . . . .” Nelson at 631.
The facts of Terry are instructive. In that case, plain clothes police detective Martin McFadden was assigned to downtown Cleveland. He observed two men walking a street, each of them repeatedly stopping to look in the same store window. Then, they were joined by a third man who talked with them briefly. Officer McFadden “testified that after observing [the two men’s] elaborately casual and oft-repeated reconnaissance of the store window on Huron Road, he suspected the two men of ‘casing a job, a stick-up,’ and that he considered it his duty as a police officer to investigate further.” Terry, supra at 6. Officer McFadden also explained that he feared the men might have a gun. Officer McFadden stopped the three men and asked their names. When the men merely “mumbled something” in response, Officer McFadden grabbed one of them and patted down the outside of his clothing, finding a gun. Eventually, he conducted a similar search of another of the men and found a gun on him as well.
The following discussion in Terry illustrates how factors that in isolation appear innocent may, in combination, provide a police officer with reasonable suspicion to justify an investigative stop:
*194 “[Officer McFadden] had observed Terry, Chilton, and Katz go through a series of acts, each of them perhaps innocent in itself, but which taken together warranted further investigation. There is nothing unusual in two men standing together on a street comer, perhaps waiting for someone. Nor is there anything suspicious about people in such circumstances strolling up and down the street, singly or in pairs. Store windows, moreover, are made to be looked in. But the story is quite different where, as here, two men hover about a street comer for an extended period of time, at the end of which it becomes apparent that they are not waiting for anyone or anything; where these men pace alternately along an identical route, pausing to stare in the same store window roughly 24 times; where each completion of this route is followed immediately by a conference between the two men on the comer; where they are joined in one of these conferences by a third man who leaves swiftly; and where the two men finally follow the third and rejoin him a couple of blocks away. It would have been poor police work indeed for an officer of 30 years’ experience in the detection of thievery from stores in this same neighborhood to have failed to investigate this behavior further.” [Id. at 22-23.]
Similarly, in itself, there is certainly nothing suspicious about four men occupying a car that is leaving an apartment complex. However, there were other factors in this case that provided Deputy Elder with reasonable suspicion to stop the car. First, as Deputy Elder explained in his testimony at both suppression hearings, he deduced that the two direct perpetrators of the bank robbery would most likely have the assistance of a getaway driver. Also, it was reported that the bank was robbed by two black males. Thus, the fact that the car had at least three occupants and at *195 least two black males[4] indicated that its occupants were consistent with the description of the suspected perpetrators.[5] Of course, that in itself would not provide the particularized suspicion necessary for a valid investigatory stop. See LoCicero, supra at 505.[6]
However, there were other factors that provided a particularized basis for Deputy Elder to reasonably suspect that occupants of the Mercedes in which defendants were present had been involved in the bank robbery. The car was spotted by Deputy Elder in the Westbay Apartments complex within fifteen minutes of the report of the bank robbery. The complex was located to the west of the bank along North Street and within a quarter mile of the bank. Deputy Elder had first essentially eliminated the direction north of the bank on the basis of two men outside the carpet store (which was north of the bank) telling *196 him that they had not seen anyone go by in that direction. He testified that he went to the Westbay Apartments complex because that would have been an excellent place to hide a getaway vehicle as the apartment complex provided a secluded area to hide a car in contrast to the parking lots of businesses near the bank.[7] In this regard, the fact that the car was leaving the apartment complex was consistent with it being a getaway vehicle that was attempting to leave the general vicinity of the crime. Thus, the suspicion of Deputy Elder reasonably focused on the Westbay Apartments. These deductions by Deputy Elder are particularly entitled to deference because
[i]n analyzing the totality of the circumstances, the law enforcement officers are permitted, if not required, to consider “the modes or patterns of operation of certain kinds of lawbreakers. From [this] data, a trained officer draws inferences and makes deductions — inferences and deductions that might well elude an untrained person.” [Nelson, supra at 636, quoting United States v Cortez, 449 US 411, 418; 101 S Ct 690; 66 L Ed 2d 621 (1981).]
On top of this, the occupants of the Mercedes drew further suspicion on themselves by their atypical conduct in each declining to look in the direction of Deputy Elder’s passing marked patrol car. As the deputy explained, in his experience as a police officer, this was highly unusual. There is no basis to conclude that this observation was inaccurate, and, accord *197 ingly, we defer to his substantial experience as a law enforcement officer. LoCicero, supra at 501-502.
For conduct to support a finding of a reasonable suspicion, it need be, as we are instructed by the United States Supreme Court, merely evasive. Indeed, the United States Supreme Court has quite recently stated that “nervous, evasive behavior is a pertinent factor in determining reasonable suspicion.” Illinois v Wardlow, 528 US 119, 124; 120 S Ct 673; 145 L Ed 2d 570 (2000). In Wardlow, the defendant was standing next to a building holding an opaque bag in an area of Chicago known for heavy narcotics trafficking. When a four-car caravan of police cars[8] entered the area, the defendant looked in the direction of the officers and fled, eventually running through a gangway and an alley. Ultimately, police officers stopped the defendant and conducted a patdown search for weapons, discovering a gun in the bag. The United States Supreme Court held that there was reasonable suspicion to support this investigatory stop in light of the defendant’s presence in an area of heavy narcotics trafficking, coupled with his unprovoked flight when he noticed the police. In making this determination, the Wardlow Court stated;
In reviewing the propriety of an officer’s conduct, courts do not have available empirical studies dealing with inferences drawn from suspicious behavior, and we cannot reasonably demand scientific certainty from judges or law enforcement officers where none exists. Thus, the determination of reasonable suspicion must be based on commonsense judgments and inferences about human behavior. [Id. at 124-125.1
*198 Further, in United States v Orozco, 191 F3d 578, 582 (CA 5, 1999), the Fifth Circuit United States Court of Appeals approved consideration of the “overall behavior of the vehicle driver,” including “the avoidance of eye contact” as one factor that might be considered in determining whether there was reasonable suspicion to support a traffic stop. Likewise, we see no reason that the overall behavior of all occupants of a car in seeming to avoid looking in the direction of a marked police car cannot be considered as one factor in support of a finding of reasonable suspicion. Accordingly, we believe that Deputy Elder was entitled to rely on his perception that it was unusual that the occupants of the Mercedes seemed to avoid looking in his direction. As in Wardlow, we do not have, nor have we been offered, the benefit of any empirical studies rebutting Deputy Elder’s experience-based conclusion regarding how people ordinarily react to marked police cars. Deputy Elder’s observation that it was suspicious for all four occupants of a car not to look at his passing police car does not strike us as unreasonable. Indeed, it may well comport with “commonsense.” Accordingly, we consider Deputy Elder’s suspicion aroused by the occupants of the car not looking at his patrol car to be one factor that is properly considered, together with other factors such as the secluded nature of the apartment complex and that the apartments were located within a quarter mile of the bank, as supporting a finding of reasonable suspicion in this case.[9]
*199 In addition to the foregoing, the route followed by the Mercedes before the traffic stop provides another factor in support of the existence of reasonable suspicion. The Mercedes took a circuitous route to the intersection of Ganson and Wisner Streets before the traffic stop was actually effected.[10] This is particularly suspicious because it involved avoiding driving by the bank that had been robbed. The most direct route to that intersection from the Westbay Apartments would have been east on North Street and then south on Wisner Street to the intersection. This would have taken the car past the bank at the intersection of North and Wisner Streets. Instead, the car took a longer route by proceeding west on North Street, then south on Brown Street, and finally east on Ganson Street before reaching the intersection of Ganson and Wisner Streets.
*200 We recognize that the route followed by the Mercedes was not mentioned in Deputy Elder’s testimony and evidently was not subjectively relied on by the police in effecting the traffic stop. Nevertheless, the location of the bank robbery and the route followed by the Mercedes were obviously facts known to the police before the traffic stop occurred. Thus, these facts are appropriately considered in determining whether there was reasonable suspicion to support the traffic stop because, as this Court unanimously recognized in People v Arterberry, 431 Mich 381, 384; 429 NW2d 574 (1988):
[T]he fact that the officer does not have the state of mind which is hypothecated by the reasons which provide the legal justification for the officer’s action does not invalidate the action taken as long as the circumstances, viewed objectively, justify that action. [Quoting Scott v United States, 436 US 128, 138; 98 S Ct 1717; 56 L Ed 2d 168 (1978).]
Accordingly, objective facts known to the police officers who effected the traffic stop should be considered in determining whether the stop was justified by reasonable suspicion regardless of whether the officers subjectively relied on those facts.
We conclude that, under the totality of the circumstances, Deputy Elder’s investigatory stop of the car at issue was supported by reasonable suspicion that occupants of that car may have been involved in the robbery of the Republic Bank. The reasons for that conclusion include: (1) the deputy encountered the car near the crime scene, given that the apartment complex was within a quarter mile of the bank; (2) the time was short, with at most fifteen minutes elapsing from the time of the report of the robbery to *201 the traffic stop; (3) the car was occupied by individuals who comported with the limited description that the officer had at his disposal; (4) Deputy Elder had tentatively eliminated the direction north of the bank as an escape route on the basis of the information he received from the carpet store employees; (5) on the basis of his familiarity with the area and experience with crimes of this nature, Deputy Elder formed the reasonable and well-articulated hypothesis that the robbers had fled to the secluded Westbay Apartments; (6) the deputy also reasonably hypothesized on the basis of his experience that the robbers would use a getaway car to try to escape from the area; (7) Deputy Elder also reasonably inferred on the basis of his experience that a driver would probably be at the getaway car waiting for the actual robbers; (8) the behavior of each of the car’s four occupants in seeming to avoid looking in the direction of the deputy’s marked police car was atypical; (9) the car was leaving the apartment complex, which is consistent with it being a getaway car whose occupants were attempting to leave the area; (10) the car followed a circuitous route that avoided driving by the site of the bank robbery.[11]
*202 The viewpoint of the dissent may best be summed up in its statement that “in this case, the sum of zero suspicion and zero suspicion is zero suspicion.” Post at 219. Whatever the obvious merits of this proposition, we respectfully disagree that it bears any relevance to this case. The factors that we have discussed above as supporting a finding of reasonable suspicion were not each of “zero suspicion” in themselves. Rather, as we have acknowledged, while the degree of suspicion from each of the factors in isolation may have fallen short of providing reasonable particularized suspicion to support the present traffic stop, that does not mean that these factors properly considered in the aggregate would not provide reasonable suspicion to support the stop under the totality of the circumstances. The validity of such a cumulative analysis, as we have discussed, is well established in our law.
It is always possible, as the dissent does, to hypothesize innocent explanations for the circumstances preceding the traffic stop. That possibility alone cannot thwart the proper efforts of law enforcement to protect onr communities. “Terry accepts the risk that officers may stop innocent people.” Wardlow, supra at 126.[12] Indeed, the possibility that innocent people will more than infrequently be briefly detained during valid investigatory stops is foreshadowed by guiding United States Supreme Court precedent, given that the reasonable suspicion needed for such stops “requires a showing considerably less than preponder- *203 anee of the evidence.” Id. at 123. As this Court explained in 1993 in Nelson, supra at 632:
[T]he absence of apparent innocent behavior has never been a requirement for the suspicion required to make an investigatory stop. United States v Sokolow, 490 US 1, 9; 109 S Ct 1581; 104 L Ed 2d 1 (1989). The question is not whether the conduct is innocent or guilty. Very often what appears to be innocence is in fact guilt, and what is indeed entirely innocent may in some circumstances provide the basis for the suspicion required to make an investigatory stop. Thus, the focus is on the “ ‘degree of suspicion that attaches to particular types of noncriminal acts.’ ” Id. at 10.
Indeed, the facts of Nelson are instructive because they also involve defendants of whom the police were reasonably suspicious because of the location of occupants in a car near a location where criminal activity was known to have occurred. In Nelson, a police informant bought a quantity of cocaine from a house that was under police surveillance. After about thirty minutes, a vehicle with three occupants (unconnected with the police informant) arrived at the house and remained for only four minutes. A detective with twenty-three years of experience testified that this behavior “was characteristic of a ‘crack-house’ buy.” Id. at 629. Shortly after leaving the house, the car in Nelson was stopped to investigate the possible drug transaction. This Court, showing deference to the experience of the police detective, held that the stop was supported by reasonable suspicion, noting that the behavior in that case “was indicative of drug trafficking.” Id. at 637-638. This Court in Nelson noted — and rejected — the argument of one of the defendant’s counsel in the trial court that there was no reasonable suspicion to support the traffic *204 stop because there were innocent explanations for the conduct such as dropping off a birthday card or stopping to say hello. This Court pointedly stated that “[t]he question is not the number of scenarios that the imagination can conjure, but the degree of suspicion conferred on the seemingly legal conduct.” Id. at 635. Accordingly, the existence of reasonable suspicion in the present case is not negated by the ability to imagine possible innocent explanations for the presence of the Mercedes at the apartment complex and the actions of the car’s occupants.
In sum, the police in the present case stopped a car that contained at least three people in a situation where the police were looking for two bank robbers and expecting to find a getaway driver as well. Because the car had at least two black male occupants, its occupants were consistent with the description of the bank robbers. After Deputy Elder eliminated the direction north of the bank, the car was found leaving a secluded area close to the bank (indeed, within a quarter mile) that was a logical hiding place.[13] The occupants of the car drew further *205 suspicion on themselves by appearing to a trained law enforcement officer to be evasive by declining to look in the direction of his marked police car as it passed close by the car. Finally, the car followed a circuitous route that avoided the site of the bank robbery before the traffic stop. While one or more of these factors in isolation may not have constituted reasonable suspicion to stop the car, under the totality of the circumstances, there was reasonable suspicion to justify the traffic stop in this case.
m. conclusion
We conclude that, under the totality of the circumstances, the police had the necessaiy reasonable suspicion to justify the traffic stop underlying these consolidated cases. Accordingly, we affirm the judgment of the Court of Appeals in each case.[14]
Corrigan, C.J., and Weaver, Young, and Markman, JJ., concurred with Taylor, J.

 Deputy Elder likewise testified at the suppression hearing in Taylor that he was looking for at least three suspects:
Well, it’s been my experience in the past that there is usually someone nearby, in a robbery attempt, with a getaway vehicle, so I would look for at least three people.

 Deputy Elder similarly testified at the suppression hearing in Taylor that no occupant of the Mercedes looked over at his patrol car. Deputy Elder explained that he found this significant because in his experience:
Inevitably, when a patrol car drives by somebody, they [sic] always look over at you. Somebody in the vehicle will look at the patrol car.

 In short, the panel in Oliver concluded that defendant Oliver could not challenge the search of Banks in which incriminating evidence was first found and that, accordingly, he could not challenge the location of other incriminating evidence as a result of the ensuing events. The parties in each case have argued the issue of the scope of the respective defendants’ “standing to challenge,” or in other words the extent to which they may avail themselves of the Fourth Amendment exclusionary rule if there were a violation of the Fourth Amendment. However, in light of our conclusion that the traffic stop was supported by reasonable suspicion (and, thus, did not violate the Fourth Amendment), we need not address these “standing to challenge” issues.

 The car was occupied by four black males, but the important point is that it had at least three occupants and at least two of those were black males. If, for example, the car would have had two black male and two white male occupants, we do not see any way that would alter the reasonable suspicion analysis.

 We note that there are certainly many ways in which it would be inappropriate for the police to use race as a factor in performing their duties. However, no reasonable person would contend that the police should disregard race where it has been reported by eyewitnesses that a crime has been committed by a person of a particular race or skin color. Simply put, it would have made no sense in the case at hand for the police to have pursued non-black individuals as having been the individuals who actually robbed the bank. As the United States Court of Appeals for the Sixth Circuit observed in United States v Waldron, 206 F3d 597, 604 (CA 6, 2000), “[c]ommon sense dictates that, when determining whom to approach as a suspect of criminal wrongdoing, a police officer may legitimately consider race as a factor if descriptions of the perpetrator known to the officer include race.”

 Thus, we certainly agree with the dissent that Deputy Elder would not have been “justified in stopping every grouping of black males in the vicinity . . . .” Post at 213. However, as we set forth in this opinion, there were a number of factors that, in combination, provided particularized suspicion for the traffic stop at issue.

 At the suppression hearing in Oliver, Deputy Elder explained that a getaway vehicle was more often “in a hidden area somewhere close by” the site of a robbery than in front of the building. In Taylor, Deputy Elder testified at the suppression hearing that his “experience tells me that they wouldn’t have put” the getaway car in the parking lot of a Wendy’s restaurant or laundromat (which were apparently among the businesses near the bank) as opposed to a more secluded place.

 The police cars were involved in an effort to investigate drug transactions in the area

 We note that defendants have cited some pre-Wardlow decisions by panels of the United States Circuit Courts of Appeals indicating that avoidance of eye contact is not properly considered as a factor in support of a finding of reasonable suspicion. However, we regard these *199 pre-Wardlow decisions to be of little value in light of the recognition in Wardlow that evasive conduct can be a factor supporting (or even providing the primary basis for) an investigatory stop. Moreover, we note that there are federal appellate decisions that consider an apparent avoidance of eye contact as one factor in support of a finding of reasonable suspicion. See, e.g., United States v Brown, 188 F3d 860, 864-865 (CA 7, 1999) (considering the defendant’s “unusually nervous demeanor, including his failure to make eye contact” as one of “several distinct articulable bases” for reasonable suspicion); United States v Robinson, 119 F3d 663, 667 (CA 8, 1997) (concluding that “the fact that [the defendant] appeared nervous and the fact that he would not make eye contact” provided “[fjurther justification” for a finding of reasonable suspicion). Of course, none of this is to suggest that the mere fact that a car passes by a patrol car without any of its occupants looking at the patrol car would justify a traffic stop, but merely that such apparent avoidance of eye contact can be one factor that, together with others, may support a stop.

 The dissent states that “it is impossible to say that the ‘route’ they [the occupants of the car] chose was ‘circuitous,’ when they had not yet traveled to a specified destination when stopped. At most, we can conclude that they chose to drive a longer distance than necessary between two points.” Post at 221. We do not perceive the distinction that the dissent would draw in this regard. It seems plain to us that a route would be “circuitous” precisely because it involved driving longer than necessary.

 As the dissent indicates, there was testimony from Deputy Elder that the car that was stopped was being driven in a manner that seemed overly cautious because of the driver’s strict compliance with traffic laws. Post at 209. However, we place no reliance whatsoever on this strict compliance with the traffic laws in concluding that there was reasonable suspicion to support the present traffic stop. Indeed, we agree with the dissent that it would seem anomalous to consider the mere fact of strict compliance with the traffic laws as being a factor in support of a finding of reasonable suspicion of criminal activity. Of course, we do not mean to suggest that an act in compliance with the law cannot be a factor in support of reasonable suspicion.

 Indeed, the United States Supreme Court pointed out in Wardlow that “the Fourth Amendment accepts that risk in connection with more drastic police action; persons arrested and detained on probable cause to believe they have committed a crime may turn out to be innocent.” Id. at 126.

 While not expressly stated, the dissent seems to suggest that one of the reasons provided by Deputy Elder for investigating the Westbay Apartments complex may have been that “he knew blacks lived there.” See post at 212-213. However, Deputy Elder never indicated that he went to the Westbay complex because “he knew from personal experience that black individuals lived there.” Post at 213. Instead, his comments in this regard were isolated responses to specific questions concerning what he had observed while he had been at the complex on a previous occasion looking for an apartment with Ms wife. Accordingly, Deputy Elder’s testimony does not reflect that he decided to go to the Westbay Apartments because of the number of African-Americans that may have lived there, but merely that he happened to know from an unrelated event that African-Americans lived there.
In any event, we, of course, agree with the dissent that there would be nothing reasonably suspicious about African-Americans merely being at the apartment complex. Rather, as we have addressed, it is the particular *205 circumstances surrounding the occupants of the car that was stopped in this case that provided reasonable suspicion for the present traffic stop.

 We note that defendant Taylor makes arguments in his brief on appeal regarding issues other than the validity of the stop of the Mercedes and the scope of his standing to challenge the evidence obtained as a result of that stop. These issues are beyond the scope of defendant Taylor’s application for leave to appeal that was previously granted by this Court. Accordingly, we decline to review those issues.