# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

KEVIN PATRICK KAVANAUGH,

        Defendant-Appellant.

FOR PUBLICATION
July 6, 2017
9:00 a.m.

No. 330359
Berrien Circuit Court
LC No. 2014-004247-FH

Before: STEPHENS, P.J., and SHAPIRO and GADOLA, JJ.

PER CURIAM.

Defendant was convicted of possession with the intent to deliver between 5 and 45 kilograms of marijuana, MCL 333.7401(2)(d)(ii). The marijuana was found in his car's trunk during a search that followed from a police dog alerting to the marijuana's smell. Defendant argues that the trial court erred in finding that the search did not violate his rights under the Fourth Amendment. He also argues that there was a *Brady* violation regarding a photo and videotape that was not timely produced. For the reasons stated in this opinion, we reverse the trial court's ruling on the Fourth Amendment claim and remand for further proceedings. Given this ruling, the *Brady* issue is moot.

## FACTS

Defendant was driving on I-196 with a female passenger when he was pulled over by Michigan State Police Trooper Michael Daniels. Daniels testified that he had observed defendant engage in two traffic violations: an improperly affixed license plate[1] and a failure to signal a lane change[2] onto an exit ramp.

Daniels asked defendant for the car's registration. Defendant responded that he had just recently purchased the car and that he did not yet have a registration. Daniels then told defendant to exit the car and to follow him. The two walked back to the police cruiser leaving

---

[1] The plate was a Florida cardboard temporary plate and was affixed by two bolts. See MCL 257.225.

[2] MCL 257.648.

the passenger in defendant's car. Daniels told defendant to sit in the front passenger seat of the police car. Daniels got into the driver's seat and said he was going to run some computer checks. While running the computer checks on defendant's license and ownership of the vehicle, Daniels asked defendant several questions and learned that he and his female passenger had been in Grand Rapids for three days. Daniels then asked what defendant and his female companion were doing in the Grand Rapids area since they were from Florida. After completing the computer checks, which confirmed defendant's ownership of the car and revealed no outstanding warrants, Daniels told defendant to stay in the cruiser and walked back to defendant's car where he spoke with defendant's female companion.

After doing so, Daniels returned to the cruiser and told defendant that he was going to give him a warning rather than a ticket for the traffic violations. He then asked defendant for consent to search the car. When defendant declined to consent, Daniels informed him that he was going to radio a request for a dog to do a contraband sniff of his vehicle and that defendant and his companion would have to remain until the dog and its handler arrived and the process completed. After about 15 minutes,[3] the dog and his officer arrived. The dog alerted at the car's trunk. The officers opened the trunk and found the marijuana. The entire course of events, from Daniels's initial observation of defendant's vehicle to defendant's arrest, was captured on video camera.

Defendant filed a pre-trial motion to suppress the evidence found in the trunk. After an evidentiary hearing, the trial court denied the motion. For purposes of the hearing, the court did not watch the videotape, and though defense counsel noted that the tape was available if the court wished to watch it, neither party specifically requested that it do so. Defendant raised the issue again at trial at which time the trial court watched the video and confirmed its prior ruling. Like the trial court, we have watched and listened to the recording. Having done so, we need not rely on the trial court's conclusions as to what the videotape contains. *City of East Grand Rapids v Vanderhart*, ___ Mich App ___, ___; ___ NW2d ___ (2017) (Docket No. 329259), slip op at 4 (Opinion by Swartzle, J.) (concluding that because an appellate court is able to review a video as easily as the trial court, the trial court's factual findings regarding that video are entitled to less deference).

FOURTH AMENDMENT ISSUES

Defendant raises two arguments grounded in the Fourth Amendment. First, he argues that Daniels lacked grounds to pull him over for a traffic stop. Second, he argues that Daniels lacked lawful grounds to detain him beyond the conclusion of the traffic stop. We disagree with defendant's first argument but agree with his second.

I. THE TRAFFIC STOP

---

[3] The videotape of the encounter indicates that at approximately the 15:25 mark defendant refused to consent to a search of his van at which point the officer told him that he was going to have a police canine come to sniff the van. The dog and its handler arrived at the 30:07 mark.

Trooper Daniels testified at the pre-trial suppression hearing and at trial. He stated that he stopped defendant because he saw what he determined to be two traffic violations. First, Daniels concluded that defendant was in violation of MCL 257.225(2) because the vehicle's license plate was flapping in the wind and unreadable while the car was moving. Second, he concluded that when getting on an exit ramp defendant violated MCL 257.648(1) by making the lane change without signaling. *People v Hrlic*, 277 Mich App 260, 263-266; 774 NW2d 221 (2007).

Defendant argued below, and again on appeal, that Daniels's stated explanations were mere pretexts for a stop that lacked a constitutional basis.[4] However, the United States Supreme Court has held that the existence of probable cause that a driver has violated a traffic law constitutionally justifies a brief detention for purposes of addressing that violation even if the officer's subjective intent for stopping the car is based on other factors. "As a general matter, the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred." *Whren v United States*, 517 US 806, 810; 116 S Ct 1769; 135 L Ed 2d 89 (1996). Because the officer had such probable cause in this case, the traffic stop was lawful and did not violate the Fourth Amendment.

## II. POST-TRAFFIC STOP DETENTION

Defendant argues, and we agree, that the traffic stop was completed when the officer determined that the vehicle was owned by defendant, gave him a warning about the traffic violations, and told him there would not be a ticket issued. After the traffic stop was completed, the officer asked defendant for permission to search his car. Defendant did not consent, at which point the officer told defendant that he was requesting that another officer bring a police dog to conduct a "sniff" for the presence of contraband in defendant's vehicle. The officer ordered defendant to remain at the scene until the dog arrived and not to enter his car while waiting.

It is black letter law that a "seizure" within the meaning of the Fourth Amendment occurs when in view of all the circumstances, a reasonable person would conclude that he was not free to leave. *United States v Mendenhall*, 446 US 544, 554; 100 S Ct 1870; 64 L Ed 2d 497 (1980). Having been ordered by the officer to remain at the scene, defendant was obviously seized under the law, and the prosecution does not disagree with this characterization.

---

[4] Prior to the stop, the officer had received a radio call to watch for a silver Honda Accord with a Florida temporary plate. He was not provided with any reasons for the request and was not provided with any indication of whether defendant was suspected of a crime. In light of this, defendant argues that the alleged traffic violations were irrelevant and that the stop was unlawful. However, the prosecution correctly argued that the radio call was irrelevant, and the constitutionality of the officer's actions must be judged on the basis of what occurred from the time the officer observed the defendant's car. This is consistent with the case-law, and we review the officer's actions based upon his observations of defendant, his passenger, and his vehicle.

Until the 2015 decision of the United States Supreme Court in *Rodriguez v United States,* ___ US ___; 135 S Ct 1609; 191 L Ed 2d 492 (2015), there was debate about whether requiring a driver to wait for a dog sniff after the traffic stop was concluded should be considered a seizure separate from the traffic stop itself or whether the basis for the traffic stop could encompass a brief additional delay for a dog sniff. In *Rodriguez*, the United States Supreme Court definitively resolved the debate, holding that "a dog sniff is not fairly characterized as part of the officer's traffic mission." *Rodriguez*, 135 S Ct at 1615. The Court explained that although police officers "may conduct certain unrelated checks during an otherwise lawful traffic stop[,]" they "may not do so in a way that prolongs the stop, absent the reasonable suspicion ordinarily demanded to justify detaining an individual." *Id*. at 1615. The Court opined, "[A] police stop exceeding the time needed to handle the matter for which the stop was made violates the Constitution's shield against unreasonable seizures." *Id.* at 1612. Once the constitutionally-sound basis for the traffic stop has been addressed, any further extension of the detention[5] in order to conduct "[o]n-scene investigation into other crimes" or for any other reason is a Fourth Amendment violation unless during the traffic stop new facts come to light that demonstrate "reasonable suspicion of criminal activity." *Id.* at 1616.

In light of these constitutional principles, we begin our analysis with the understanding that the continued detention of defendant and his vehicle after the traffic stop's conclusion was unconstitutional unless, "[the] traffic stop reveal[ed] a new set of circumstances," *People v Williams*, 472 Mich 308, 315; 696 NW2d 636 (2005), that lead to "a reasonably articulable suspicion that criminal activity is afoot," *People v Jenkins*, 472 Mich 26, 32; 691 NW2d 759 (2005). "Whether an officer has a reasonable suspicion to make such an investigatory stop is determined case by case, on the basis of an analysis of the totality of the facts and circumstances. A determination regarding whether a reasonable suspicion exists 'must be based on commonsense judgments and inferences about human behavior.' " *Id.* quoting *People v Oliver*, 464 Mich 184, 197; 627 NW2d 297 (2001) (citations omitted). "That suspicion must be reasonable and articulable . . . ." *People v Nelson*, 443 Mich 626, 632; 505 NW2d 266 (1993). "[I]n determining whether [a police] officer acted reasonably in [extending the detention], due weight must be given, not to his inchoate and unparticularized suspicion or 'hunch,' but to the specific reasonable inferences which he is entitled to draw from the facts in light of his experience." *Terry v Ohio*, 392 US 1, 27; 88 S Ct 1868; 20 L Ed 2d 889 (1968).[6]

---

[5] Even if the officer has not yet completed the traffic violation matters, if conducting a canine sniff causes that completion to be delayed, it remains a constitutional violation. As stated in *Rodriguez*, the question is not "whether the dog sniff occurs before or after the officer issues a ticket," but "whether conducting the sniff 'prolongs'-i.e., adds time to-'the stop[.]' " *Rodriguez*, 135 S Ct at 1616.

[6] Defendant's refusal to consent to a search cannot serve as grounds for reasonable suspicion. "A refusal to consent to a search cannot itself form the basis for reasonable suspicion: 'it should go without saying that consideration of such refusal would violate the Fourth Amendment.' " *United States v Santos*, 403 F3d 1120, 1125-1126 (CA 10, 2005), quoting *Wood*, 106 F3d 942,

We have reviewed the relevant testimony as well as the complete video/audio recording of the encounter from Daniels's first observation of defendant's car through the arrest.[7] On the basis of this review, we have concluded that Daniels did not have a reasonable suspicion of any criminal activity sufficient to justify his extension of the traffic stop to allow for a dog sniff. Daniels's stated justifications were either not consistent with the videotape record or were not sufficient to create a reasonable suspicion of criminal activity.[8]

Daniels testified that his suspicions were first raised because defendant did not pull over until he had nearly reached the end of the exit ramp. However, Daniels agreed that defendant did not appear to be attempting to flee or attempting to avoid the stop. Perhaps more to the point, the video makes plain that, until the end of the ramp where the roadway widened, there was very little, if any, room for a car to pull over.[9] Given this fact and the absence of any indication of flight, this explanation carries very little weight.[10]

Daniels further testified that a factor in his decision to detain defendant was his belief that defendant appeared nervous throughout the encounter. Daniels stated that defendant's hands were shaking when he gave him his license, that he appeared increasingly nervous while sitting in the police car, and that he made little eye contact. The video does not include the passing of the license, but, having viewed the video, we cannot discern any evidence of unusual or increasing levels of nervousness in defendant during his interactions with Daniels. In addition,

946 (CA 10, 1997). As stated in *Santos*, "If refusal of consent were a basis for reasonable suspicion, noting would be left of Fourth Amendment protections." 403 F3d at 1126.

[7] The video was recorded on a camera in Daniels's vehicle. Most of the time, the camera was directed forward out the front windshield to show defendant's car. However, when defendant was seated in the police car, Daniels turned the camera so that it recorded the events inside the car.

[8] Real-time recordings of such encounters are of substantial assistance to both trial and appellate courts. Rather than relying on varied recollections and attempts to judge credibility, the court can, in large measure, hear and see the relevant facts for itself. This provides direct information and may also assist the court in assessing the reliability of witnesses who testify as to events seen on the tape. Absent a claim that the recording is incomplete or somehow unreliable it allows for fact-finding that does not depend on the vagary of memory or bias. Therefore, whenever practicable, such videotapes should be provided to the court, the court should review them, and they should be made part of the record on appeal.

[9] The right side of the ramp had a very narrow shoulder and a guardrail, which did not provide enough space for defendant's vehicle to get off of the one-lane exit. Adjacent to the left side was a ditch.

[10] Daniels also testified that, while on the exit ramp, he saw defendant make movements as if to place something on the floor of the car. On review of the videotape, we cannot discern any such movement, but we agree that Daniels could have seen movement that the videotape did not capture.

defendant is videotaped in the front seat of the police car for an extended period sitting both with Daniels and, for some time, alone. He does not display any overt nervousness, and any opportunity for eye contact was greatly limited by the fact that the officer's eyes were at his computer screen at almost all times even when defendant attempted to engage him in conversation. Whether the license and vehicle check took this much attention or if Daniels employed it as an interrogation technique, the video clearly shows that eye contact with Daniels was not available and that defendant did not seem to be making any special efforts to avoid it.[11] Moreover, the courts have given little weight to considerations of nervousness in a traffic stop. See *United States v Richardson*, 385 F3d 625, 630-631 (CA 6, 2004) (stating that "nervousness . . . is an unreliable indicator, especially in the context of a traffic stop" and noting that "[m]any citizens become nervous during a traffic stop, even when they have nothing to hide or fear"); *United States v Simpson*, 609 F3d 1140, 1147-1148 (CA 10, 2010) (also recognizing that nervousness is "of limited significance" in determining whether reasonable suspicion exists because most citizens exhibit signs of nervousness when confronted by law enforcement whether innocent or guilty and because absent "significant knowledge of a person, it is difficult, even for a skilled police officer, to evaluate whether a person is acting normally for them or nervously").

Daniels also pointed to the fact that defendant could not produce the registration or title for the vehicle and stated he had only recently purchased it and had not yet been provided with all the paperwork. We agree that if the defendant was driving an out-of-state car that did not belong to him it would provide reasonable suspicion that defendant may have stolen the car. However, the officer promptly ran the vehicle's VIN number and determined that defendant was in fact the vehicle's owner and that there were no warrants for him. We cannot conclude that concern about the vehicle's ownership justified the subsequent detention, and the officer did not testify as to any other reason why, based on his experience or knowledge, not having his registration provided grounds to suspect defendant of criminal activity.

Daniels claimed that his suspicions were further raised because, when he directed defendant to sit with him in front of the parked police car, defendant did not close the passenger door. Daniels described this as unusual. However, he failed to articulate any basis to conclude that this was suspicious behavior or that in his experience it indicated criminal activity;[12] and the prosecution has, similarly, failed to refer us to any cases that support such an inference. Of course, had defendant actually attempted to leave, it would be highly suspicious, but merely allowing the door to remain open is not indicative of flight.[13] In the video it is clear that

---

[11] To the degree the trial court made findings consistent with the officer's testimony in this regard, such as the trial court's finding that defendant was "extremely nervous," we find such findings to be clearly erroneous in light of the videotape evidence. The disparity between the officer's testimony and the events recorded on the videotape, particularly as it concerns the officer's testimony about defendant's nervousness, also raises questions about the trial court's finding that the officer was credible.

[12] Indeed, Daniels even stated that he does not close the passenger door when placing individuals in the front seat of the cruiser in such situations "so that they feel like they're free to leave."

[13] Some might even feel it improper to close the door when the officer purposely left it open.

defendant made no movements suggesting he was planning on fleeing and that he obeyed the officer's commands in all respects and with ready cooperation. We reject the officer's observation about the door as serving as grounds to support reasonable suspicion.

Daniels also testified that he spoke separately with defendant and his passenger and they gave differing answers to some questions. They agreed that they had driven from Florida and had been visiting friends in Grand Rapids, but when asked if they were boyfriend and girlfriend, defendant said they were "just friends", while the passenger said "well, we're trying to be." We do not believe these answers to necessarily be inconsistent or that if they are, that they indicate any likelihood of criminal activity. The officer certainly did not articulate in his testimony why they did. Defendant and his female passenger also named different hotels when asked where they had stayed in Grand Rapids,[14] and defendant said they didn't do anything special while his passenger said they went to an "art festival" and "apple orchard." In the absence of an articulated basis, slightly different answers to three general questions, none of which go to criminal activity, by two people travelling together is not grounds to reasonably suspect them of a criminal activity.

It is not enough that an officer have an "inchoate and unparticularized suspicion or "hunch." *Terry*, 392 US at 27. He must be able to articulate the specific reasonable inferences which he is entitled to draw from the facts in light of his experience." *Id.* Here, the officer has listed some aspects of the stop that he found "unusual." As we have already observed, however, some of his testimony is not consistent with the videotape record. More to the point, is the fact that in his testimony, the officer was never able to articulate any specific inferences of possible criminal activity.[15] We understand that police officers have extensive experience and that their

---

[14] The passenger said they stayed at the Grand Village Inn and defendant said they stayed at Travel Lodge.

[15] The facts of this case contrast sharply with those in *People v Oliver*, 464 Mich 184; 627 NW 2d 297 (2001), where the stop was upheld against a Fourth Amendment challenge. There the facts did clearly provide an articulable inference of criminal activity. The Court noted the following observations of a vehicle during a stop made shortly after a local bank robbery:

> (1) the deputy encountered the car near the crime scene, given that the apartment complex was within a quarter mile of the bank; (2) the time was short, with at most fifteen minutes elapsing from the time of the report of the robbery to the traffic stop; (3) the car was occupied by individuals who comported with the limited description that the officer had at his disposal; (4) [the deputy] had tentatively eliminated the direction north of the bank as an escape route on the basis of the information he received from the carpet store employees; (5) on the basis of his familiarity with the area and experience with crimes of this nature, [the deputy] formed the reasonable and well-articulated hypothesis that the robbers had fled to the secluded Westbay Apartments; (6) the deputy also reasonably hypothesized on the basis of his experience that the robbers would use a getaway car to try to escape from the area; (7) [the deputy] also reasonably

hunches sometimes turn out to be correct. However, the constitutional requirement is clear. A hunch is not enough. *Id.* and see *Nelson*, 443 Mich at 632 (a suspicion must be articulable in order to be reasonable). If it was, many more stops of wholly innocent persons would occur, and the enforcement of the rule where the person is guilty is necessary in order to preserve the rights of the innocent against unlawful police detentions and searches.[16]

We reverse the trial court and hold that the detention after the end of the traffic stop in order to wait for the dog was unlawful under *Rodriguez*. Accordingly, the evidence obtained as a result of that detention must be suppressed.

## BRADY ISSUES

Defendant argues that two pieces of evidence were not provided in timely fashion to his attorney: a color enlarged photo of the defendant's license plate and a second videotape of the scene that was recorded by the police car that brought the dog. Defendant argues that this delay constituted a due process violation. This issue is moot. Defendant is now in the possession of the evidence he claims was wrongfully withheld by the prosecution. We are remanding this case, and if it is again tried, defendant will have the evidence. See *People v Cathey*, 261 Mich App 506, 510; 681 NW2d 661 (2004) ("An issue is moot when an event occurs that renders it impossible for the reviewing court to fashion a remedy to the controversy.").

## CONCLUSION

Detaining defendant to wait for a drug sniffing dog and its handler to arrive and perform their work was an unconstitutional seizure of his person. The fruits of this wrongful seizure should not have been admitted. For this reason, we reverse his conviction and remand to the trial court for further proceedings.

---

inferred on the basis of his experience that a driver would probably be at the getaway car waiting for the actual robbers; (8) the behavior of each of the car's four occupants in seeming to avoid looking in the direction of the deputy's marked police car was atypical; (9) the car was *leaving* the apartment complex, which is consistent with it being a getaway car whose occupants were attempting to leave the area; (10) the car followed a circuitous route that avoided driving by the site of the bank robbery. [*Id.* at 200-201.]

[16] Since an innocent person will not be arrested the legality of the stop will never be tested in court. Maintaining respect for the Fourth Amendment therefore requires nothing less than its consistent enforcement even when the illegal search reveals clear evidence of guilt.

Reversed and remanded.  We do not retain jurisdiction.

/s/ Cynthia Diane Stephens
/s/ Douglas B. Shapiro
/s/ Michael F. Gadola