PEOPLE v LEWIS

Docket No. 231954. Submitted December 5, 2001, at Grand Rapids. Decided April 26, 2002, at 9:15 A.M.

Thomas J. Lewis was charged in the Kalamazoo Circuit Court with possession with intent to deliver five or more, but less than forty-five, kilograms of marijuana. Police officers on a Kalamazoo-area drug squad had received a tip that the defendant, a Kalamazoo resident, would fly from Detroit to Corpus Christi, Texas, and back to Detroit within a twenty-four-hour period. The officers placed the defendant under surveillance upon his return to Detroit and followed him on his drive back to Kalamazoo, where one of the officers stopped the defendant's automobile for an expired license plate. After issuing a warning about the expired registration, the officer asked the defendant for permission to search the automobile. The defendant initially consented to the search, but later withdrew consent, at which point the officer summoned an officer with a drug-sniffing dog. The dog indicated the presence of a controlled substance in the automobile, and the officers found marijuana in the defendant's luggage inside the automobile. The defendant moved for the suppression of the evidence of the marijuana and for a dismissal of the charge. The court, J. Richardson Johnson, J., granted the motions, ruling that the officer, upon issuing the warning for the expired registration, lacked probable cause to further detain the defendant to conduct a search of the automobile, thus rendering the seizure of the marijuana a violation of the Fourth Amendment. The prosecution appealed.

The Court of Appeals *held*:

A person has been "seized" under the Fourth Amendment when a police officer has restrained the person's individual freedom. Generally, seizures are reasonable for purposes of the Fourth Amendment only if based on probable cause. A limited exception to the requirement of probable cause exists, however, when the officer has a reasonable, articulable suspicion that the person has committed or is about to commit a crime. In this case, the defendant's continued detainment after the expired registration warning was supported by a reasonable, articulable suspicion that he was involved in drug trafficking in light of the following circumstances: the

defendant had made a quick visit to Corpus Christi, a city reputed to be a source of illicit drugs; the defendant had appeared nervous throughout the time he was under police surveillance; the defendant had two pieces of luggage, excessive for the brief stay in Corpus Christi; the defendant had been extremely nervous during the traffic stop; and the defendant had lied to the police about his itinerary on the day he was stopped.

Reversed and remanded for further proceedings.

SEARCHES AND SEIZURES — INVESTIGATORY STOPS — REASONABLE, ARTICULABLE SUSPICION.

A police officer may make a valid investigatory stop of a person if the officer has a reasonable, articulable suspicion that the person has committed or is about to commit a crime; reasonable suspicion entails something more than an inchoate or unparticularized suspicion or "hunch," but less than the level of suspicion required for probable cause; the suspicion must be based on an objective manifestation of criminal activity as judged by those versed in the field of law enforcement when viewed under the totality of the circumstances (US Const, Am IV; Const 1963, art 1, § 11).

*Jennifer M. Granholm*, Attorney General, *Thomas L. Casey*, Solicitor General, *James J. Gregart*, Prosecuting Attorney, and *Heather S. Bergmann*, Assistant Prosecuting Attorney, for the people.

*Plaszczak & Bauhof, P.C.* (by *James F. Bauhof*), for the defendant.

Before: WILDER, P.J., and GRIFFIN and SMOLENSKI, JJ.

WILDER, P.J. The prosecution appeals as of right orders of the Kalamazoo Circuit Court granting defendant's motion to suppress evidence consisting of approximately fifty-six pounds of marijuana seized from defendant's vehicle, and dismissing the case without prejudice. We reverse and remand.

I. FACTS AND PROCEDURAL BACKGROUND

A. INTRODUCTION

On June 22, 2000, defendant's vehicle was searched by police officers of the Kalamazoo Valley Enforcement Team (KVET) after he was stopped for driving with an expired license plate in violation of MCL 257.255 on westbound I-94 in Kalamazoo County. During the search, the officers discovered a substantial amount of marijuana in two suitcases located in the rear of the vehicle. On the basis of this discovery, defendant was charged with possession with intent to deliver marijuana, MCL 333.7401(2)(d)(ii).[1] Before trial, defendant moved to suppress evidence of the marijuana, arguing that the circumstances of the traffic stop and his detention following the traffic stop, as well as the search of his vehicle, violated the Fourth Amendment of the United States Constitution and therefore resulted in an illegal seizure. Following a suppression hearing, the trial court granted defen-

---

[1] MCL 333.7401 provides, in part:

(1) Except as authorized by this article, a person shall not manufacture, deliver, or possess with intent to manufacture or deliver, a controlled substance . . . .

(2) A person who violates this section as to:

\*    \*    \*

(d) Marihuana or mixture containing marihuana is guilty of a felony punishable as follows:

\*    \*    \*

(ii) If the amount is 5 kilograms or more but less than 45 kilograms, or 20 plants or more but fewer than 200 plants, by imprisonment for not more than 7 years or a fine of not more than $500,000.00, or both.

dant's motion, finding that "the arresting officer did not have probable cause to detain the defendant to search his vehicle." At the time of trial, the prosecution stated it was unable to proceed without the evidence suppressed by the trial court. Accordingly, the trial court entered an order dismissing the case without prejudice. The prosecution now appeals as of right.

### B. UNDERLYING FACTS PERTAINING TO THE TRAFFIC STOP AND DETENTION

At the suppression hearing, the trial court heard testimony from Sergeant Earle Martin, Jr., Officer Mike Phelps, and Officer Robert Rodriguez. Martin, supervising officer for the KVET, testified that the KVET had received information that defendant, a resident of Kalamazoo, had purchased a round-trip airline ticket from Detroit to Corpus Christi, Texas, that he was scheduled to depart from Detroit Metropolitan Airport at about 9:00 A.M. on June 21, 2000, and that he would return to Detroit Metropolitan Airport the following morning at approximately 9:00 A.M. Because of the short duration of defendant's stay in Texas and Corpus Christi's reputation as a "source city" for drugs, Martin suspected that defendant might be involved in drug trafficking and placed defendant under surveillance.

On June 22, 2000, Martin, along with three other KVET officers, including Officer Rodriguez of the canine unit,[2] traveled to Detroit Metropolitan Airport

---

[2] Rodriguez testified that the canine involved in this case had been certified by the North American Work Dog Association and the United States Police Canine Association after undergoing one hundred hours of training, which consisted of locating quantities of marijuana, methamphetamine,

to conduct surveillance of the defendant. The officers arrived at the gate defendant would be using just as defendant was getting off the plane. Martin testified that defendant appeared to be nervous as he headed toward the baggage claim area. Martin observed that defendant scanned the area by making deliberate side-to-side glances and that when defendant went outside to smoke a cigarette, defendant's demeanor in smoking the cigarette—immediately lighting it up, looking around, and taking several long deep "drags"—was additional evidence that defendant was nervous.

Martin testified that when defendant arrived at the baggage claim area, defendant "walked right up to the wall, where the luggage comes out of the wall . . . and started looking inside to find out when the luggage was coming through." Martin observed defendant continue to peek inside the baggage carousel and scan the entire baggage claim area until he received his luggage. Once the baggage carousel began to move, defendant picked up two bags, left the building, and proceeded to a "Suburban" parked in the short-term parking lot near the building. Martin also testified that he, Martin, radioed the officers that were with him to give them a description of defendant's bags and vehicle. Martin testified that "one [of the bags had] an extended handle and wheels" and that defendant had placed the other bag on top of the bag with wheels.

Martin then testified that he and the three other KVET officers followed defendant from the airport parking lot onto I-94 west toward Kalamazoo. Martin

heroin, and cocaine. He also testified that he had worked with this canine in over eighty investigations and that she had detected narcotics without failure in those investigations.

stated that while following defendant back to Kalamazoo:

> [W]e surveiled [sic] [defendant] all the way from Detroit back towards Kalamazoo. In the meantime, we were able to get his license plate number. We ran that and found out that his license plate was expired, which is a misdemeanor. So, we had a valid traffic stop, when we wanted to stop him. I radioed back to Officer Phelps and requested that he get into one of our semi-marked police cruisers and wait near the east Kalamazoo County boundary for [defendant] and his vehicle to enter Kalamazoo County and then I wanted him to stop the vehicle. . . . I told him that he had an expired plate. I told him—many of the things that I already noted during my visual contact with [defendant] when he got off of the plane. I told him to try and get consent [to search the vehicle] after his traffic stop. . . .

Martin further testified that he informed Officers Rodriguez and Phelps that if consent was not obtained, he wanted Officer Rodriguez "to immediately go up to the vehicle . . . to see if his dog could pick up any drug odor around the vehicle." After entering Kalamazoo County, Martin observed Officer Phelps stop defendant's vehicle just west of the Galesburg rest stop located on westbound I-94. Martin and his crew drove into the rest stop area and "waited for Officer Phelps to conduct his investigation."

Officer Phelps' testimony substantially corroborated the sequence of events testified about by Martin. Phelps further testified that after defendant's vehicle was stopped, he approached it and noticed that defendant was extremely nervous and that his face was "[a]shen in color." Defendant's hands also were "twitching" as "he was searching for his driver's license, registration, and proof of insurance." Phelps testified that "as I asked [defendant] to step from the

vehicle, he further lost color in his face" and remained nervous throughout the entire stop. Phelps estimated that "a total of eight to ten minutes" elapsed from the time of the traffic stop to the time the search of defendant's vehicle began.

Phelps further testified that during the traffic stop defendant lied to Phelps about where he was returning from and the reason for his trip. According to Phelps, defendant initially told him that he was returning from the Ann Arbor area, where he had been looking at a roofing job and that he was starting his own business. When Phelps later again asked defendant where he was coming from, defendant told him that he was returning from Dexter and that "he drove there this morning and was driving back this afternoon." Phelps then testified that he returned to his vehicle and relayed the information he obtained from his investigation to the KVET officers waiting at the rest stop.

Phelps then returned to defendant's vehicle, gave defendant his driver's license and registration, and informed defendant that he "was just going to give him a verbal warning and not issue any citations for the expired plate and the garter which was hanging from his rearview mirror."[3] Phelps then asked defendant for permission to search his person. Defendant consented to this search, and Phelps found more than $400 in cash in defendant's pants pockets. Phelps then asked defendant for permission to search his vehicle. Defendant asked Phelps why he wished to search the vehicle, and Phelps explained that "I-94 is

---

[3] Apparently, Officer Phelps believed that the garter hanging from the rearview mirror obstructed the driver's view in violation of MCL 257.709(1)(c).

a major thoroughfare between Detroit and Chicago in which a lot of drugs are trafficked between those two cities and also into Kalamazoo." Defendant then agreed to the vehicle search. Phelps testified: "I asked him if there was anything in the vehicle and he stated that there was not and I again asked him if I was going to find anything and at that time he stated that he did not want me to search . . . his vehicle."

After defendant withdrew his consent to search the vehicle, Phelps informed defendant that he was not free to go, placed him in the patrol car, and contacted Officer Rodriguez and Sergeant Martin. Martin decided that because of the short duration of defendant's trip to a reputed "source city," the amount of luggage with which defendant traveled, defendant's nervous behavior at the airport and during the traffic stop, and the fact that defendant gave Phelps false information about his travel itinerary that day, there was "at minimum, reasonable suspicion to detain [the vehicle], [and] probable cause to search it." Martin then ordered Rodriguez and the canine to the scene.[4]

According to Phelps, Rodriguez and the canine arrived at the scene in "less than two minutes" and the canine "had a positive indication on the passenger side of the vehicle for drugs."[5] Rodriguez testified that he was at the scene with the canine "within 15 or 30 seconds of Officer Phelps letting us know that [defen-

---

[4] The record is unclear regarding whether Martin was informed specifically by Phelps, was informed by Rodriguez, or was informed simultaneously as a result of being on the same radio frequency. In any event, it is undisputed that Martin was made aware of the situation and made the decision that Rodriguez should approach the vehicle with the canine.

[5] During cross-examination, Phelps admitted that at the preliminary examination he had testified that it took about four minutes for Rodriguez to arrive at the scene.

dant] denied consent."[6] Rodriguez also testified that the dog alerted to the scent of drugs at the rear door on the passenger side of the vehicle. After the alert, the other KVET officers arrived at the scene, conducted a full search of the vehicle, and found twenty-eight bundles of marijuana, averaging about two pounds each, inside two suitcases. Defendant was then placed under arrest on suspicion of possession with intent to deliver marijuana.

Defendant did not testify during the suppression hearing. During closing arguments, defense counsel argued that the officers did not have probable cause either to detain defendant or to search his vehicle. The prosecutor conceded that the officers did not have probable cause to search the vehicle at the time defendant revoked his consent to search. However, the prosecutor contended that the officers had a sufficient reasonable, articulable suspicion that defendant was involved in drug trafficking and that this suspicion permitted the officers to detain defendant in order to allow a canine unit to walk around the vehicle. The prosecutor further contended that the canine's alert on the vehicle established probable cause to search for drugs.

In granting defendant's motion, the trial court found:

> Officer Phelps did not have probable cause to detain the defendant to search the defendant's vehicle. In making this decision the court does not question whether the police had probable cause to search the defendant's vehicle after the canine unit indicated the possible presence of narcotics.

---

[6] Martin also testified that Rodriguez and the canine were at the vehicle "within 10 or 15 seconds" of Phelps' informing them that consent had been denied.

> The court recognizes that the use of dogs to detect the presence of contraband does not amount to a search as defined by the Fourth Amendment. See *United States v Place*, 462 US 696, 706 [103 S Ct 2637; 77 L Ed 2d 110] (1983). Rather, the decision rests upon the lack of probable cause to detain the defendant for any period of time whatsoever. Once the police engaged in this unlawful detention, all subsequently discovered evidence should be suppressed. Therefore, examining the totality of the circumstances before Officer Phelps at the time he made the determination to detain defendant long enough to have the canine unit conduct a search of his vehicle, the court concludes that the officer did not have probable cause to believe that contraband or evidence of a crime would be found in the defendant's vehicle or that the defendant committed a crime.

The drug evidence having been suppressed and the prosecution being unable to proceed without this evidence, the trial court dismissed the case without prejudice on December 15, 2000.

## II. STANDARD OF REVIEW

This Court's review of a lower court's factual findings in a suppression hearing is limited to clear error and those findings will be affirmed unless we are left with a definite and firm conviction that a mistake was made. *People v Davis*, 250 Mich App 357, 362; 649 NW2d 94 (2002), citing *People v Custer*, 242 Mich App 59, 64; 618 NW2d 75 (2000), rev'd in part on other grounds 465 Mich 319; 630 NW2d 870 (2001). See also *People v Burrell*, 417 Mich 439, 448; 339 NW2d 403 (1983), and *People v Lombardo*, 216 Mich App 500, 504; 549 NW2d 596 (1996). However, the lower court's ultimate ruling with regard to the motion to suppress is reviewed de novo, *Davis, supra; Custer, supra;*

*People v Garvin*, 235 Mich App 90, 96; 597 NW2d 194 (1999), because the application of constitutional standards regarding searches and seizures to undisputed facts is entitled to less deference. *People v Oliver*, 464 Mich 184, 191; 627 NW2d 297 (2001).

### III. THE ISSUES ON APPEAL

On appeal, the prosecution first argues that the trial court erred in ruling that probable cause, and not reasonable suspicion, to believe that defendant was in possession of illegal drugs was required before the police could briefly detain defendant at the roadside after the valid traffic stop in this case had been completed. We agree that the trial court's ruling was in error. The prosecution further argues that the trial court erred in finding that the totality of the circumstances did not support the police detention of defendant long enough to determine whether the trained canine would detect the presence of narcotics in defendant's vehicle. Again, we agree that the trial court erred.

### IV. ANALYSIS

The right to be free from unreasonable searches and seizures is guaranteed by both the United States Constitution and the Michigan Constitution. US Const, Am IV; Const 1963, art 1, § 11. Neither the state nor federal constitution forbids all search and seizures, but only unreasonable ones. *People v Rice*, 192 Mich App 512, 517; 482 NW2d 192 (1992), citing *Harris v United States*, 331 US 145, 150; 67 S Ct 1098; 91 L Ed 1399 (1947), and *People v Jordan*, 187 Mich App 582, 586; 468 NW2d 294 (1991). A person has

been "seized" under the Fourth Amendment when a police officer has restrained the person's individual freedom. See *People v Chambers*, 195 Mich App 118, 121; 489 NW2d 168 (1992), citing *Terry v Ohio*, 392 US 1, 16; 88 S Ct 1868; 20 L Ed 2d 889 (1968). Generally, seizures are reasonable for purposes of the Fourth Amendment only if based on probable cause, *People v Hamp*, 170 Mich App 24, 32; 428 NW2d 16 (1988), vacated in part 437 Mich 865 (1990) (citing *Dunaway v New York*, 442 US 200, 207-209; 99 S Ct 2248; 60 L Ed 2d 824 (1979).

A limited exception to the requirement of probable cause exists, however, when the officer has a "reasonable, articulable suspicion" that the person has committed or is about to commit a crime. *Oliver*, *supra* at 192-193, citing *Terry, supra* at 30-31. See also *People v Christie (On Remand)*, 206 Mich App 304, 308; 520 NW2d 647 (1994). In *People v Champion*, 452 Mich 92, 98-99; 549 NW2d 849 (1996), our Supreme Court observed:

> Police officers may make a valid investigatory stop if they possess "reasonable suspicion" that crime is afoot. Reasonable suspicion entails something more than an inchoate or unparticularized suspicion or "hunch," but less than the level of suspicion required for probable cause.
>
> A valid investigatory stop must be justified in its inception and must be reasonably related in scope to the circumstances that justified interference by the police with a person's security. Justification must be based on an objective manifestation that the person stopped was or was about to be engaged in criminal activity as judged by those versed in the field of law enforcement when viewed under the totality of the circumstances. The detaining officer must have had a particularized and objective basis for the suspicion of criminal activity. [Citations omitted.]

In *Oliver* the Supreme Court expanded on its prior discussion of "reasonable suspicion":

> [I]n determining whether the totality of the circumstances provide reasonable suspicion to support an investigatory stop, those circumstances must be viewed "as understood and interpreted by law enforcement officers, not legal scholars . . . ." Also, "[c]ommon sense and everyday life experiences predominate over uncompromising standards."

> \*    \*    \*

> "In analyzing the totality of the circumstances, the law enforcement officers are permitted, if not required, to consider 'the modes or patterns of operation of certain kinds of lawbreakers. From [this] data, a trained officer draws inferences and makes deductions—inferences and deductions that might well elude an untrained person.' "

> \*    \*    \*

> For conduct to support a finding of a reasonable suspicion, it need be, as we are instructed by the United States Supreme Court, merely evasive. Indeed, the United States Supreme Court has quite recently stated that "nervous, evasive behavior is a pertinent factor in determining reasonable suspicion." *Illinois v Wardlow*, 528 US 119, 124; 120 S Ct 673; 145 L Ed 2d 570 (2000). [*Oliver, supra* at 192-197 (citations omitted).]

Because defendant was driving his vehicle with expired license plates, there is no dispute that the initial stop, questioning, and detainment of defendant was justified. However, defendant challenged his continued detention by the officers once the traffic stop had been concluded, and the trial court held that in the absence of probable cause at the conclusion of the traffic stop, defendant's further detention was impermissible. This ruling by the trial court was clearly erroneous, because the officers were only

required to have a reasonable, articulable suspicion that defendant was involved, or was about to be involved, in criminal activity in order to further briefly detain him. *Id.*; *Champion, supra* at 98; *People v Shabaz*, 424 Mich 42, 54; 378 NW2d 451 (1985), quoting *United States v Cortez*, 449 US 411, 417-418; 101 S Ct 690; 66 L Ed 2d 621 (1981).

Evaluating the record before us under the correct legal standard, we further conclude that the totality of the circumstances created a particularized and objective basis to suspect defendant of being involved in criminal activity. *Oliver, supra* at 192, 196; *Champion, supra* at 99. See also *Shabaz, supra* at 55-56, quoting *Cortez, supra* at 417-418. The evidence established that the KVET law enforcement team suspected defendant may have been involved in drug trafficking because (1) defendant had taken a one-day round-trip flight from Detroit to Corpus Christi, a reputed source city for drugs;[7] (2) defendant's stay in Corpus Christi

---

[7] Defendant cites *United States v Andrews*, 600 F2d 563, 566-567 (CA 6, 1979), to argue that the fact that the police officers labeled Corpus Christi as a source city for narcotics should not be given any weight. We cannot agree. Even if the fact that an individual traveled from a reputed source city for drugs is insufficient, standing alone, to establish reasonable suspicion, see *United States v Williams*, 271 F3d 1262, 1270 (CA 10, 2001), after *Andrews* the United States Courts of Appeals have consistently and routinely found that travel to and from known source cities for a short duration can be considered, under the totality of the circumstances, in determining whether there was reasonable suspicion to stop individuals or probable cause to search either individuals or their belongings. See *United States v Currency, US $42,500.00*, 283 F3d 977 (CA 9, 2002) (Government had probable cause to initiate forfeiture proceedings in part on the basis of the fact the traveler was traveling between well-known source cities for drugs); *Williams, supra* at 1270 (reasonable suspicion to detain the defendant for a drug sniff of his vehicle at the conclusion of a traffic stop when the rental car was rented in a distant city known as a source city for drugs); *United States v Smith*, 273 F3d 629, 635 (CA 5, 2001) (forty-eight hour stay in a known source city for drugs, coupled with other facts, was sufficient to amount to reasonable suspicion); *United*

was about twelve hours, most of which was during the middle of the night; (3) defendant appeared nervous from the time he disembarked from the plane until he retrieved his luggage and began his trip back to Kalamazoo, see *Wardlow, supra* at 124, and *Rice, supra* at 518;[8] and (4) defendant retrieved two pieces of luggage, which on the basis of the length of his stay in Corpus Christi seemed excessive. In addition, after defendant was stopped for the expired plate violation, Officer Phelps observed that defendant was nervous throughout the duration of the stop, lost color in his face (which got worse after he was asked to get out of the car), and had twitching hands. See *United States v Williams*, 271 F3d 1262, 1268-1269 (CA 10, 2001) (extreme nervousness lasting throughout the entire traffic stop should not be ignored under the totality of the circumstances). Further, because Officer Phelps was aware that defendant had disembarked from a flight arriving from Corpus Christi and was returning to Kalamazoo from Detroit Metropolitan Airport, he knew that defendant was not being truthful when defendant stated he was traveling from the Ann Arbor area after having traveled there earlier that morning. These facts, coupled with Officer

---

*States v Baro*, 15 F3d 563, 568 (CA 6, 1994) (travel to an alleged drug source city, late arrival at the airport, and nervousness are inherently suspicious activities that are probative in deciding whether the government has established probable cause); *United States v Bowles*, 625 F2d 526, 534 (CA 5, 1980) (finding that the fact that suspect was traveling from Los Angeles, a known source city for narcotics, was "not an insignificant factor" in determining reasonable suspicion); *United States v Alpert*, 816 F2d 958, 961 (CA 4, 1987) (all tickets found were for travel between Miami and New York, which were source and destination cities for drugs).

[8] In *Rice, supra* at 518, the police officer's reasonable suspicion was based, in part, on the fact that defendant returned from a known source city for drugs and "repeatedly looked over his shoulder."

Phelps' knowledge that I-94 is a major thoroughfare for transporting drugs between Detroit and Chicago, establish under the totality of the circumstances a reasonable, articulable suspicion that defendant may have been involved in drug trafficking. Accordingly, defendant's brief detention to investigate whether he was involved in drug trafficking was proper. See *Oliver, supra* at 192, 196; *Champion, supra* at 98-99; *Shabaz, supra* at 54-56.

Although the trial court recognized that use of the narcotic detection canine did not constitute a search of the vehicle, we further emphasize that the detention of defendant to permit the canine to arrive at the scene did not require probable cause. As this Court stated in *Rice, supra* at 517-518:

> In *United States v Place,* 462 US 696; 103 S Ct 2637; 77 L Ed 2d 110 (1983), the United States Supreme Court dealt with the issue whether the Fourth Amendment prohibits law enforcement authorities from temporarily detaining personal luggage for exposure to a trained narcotics-detection dog on the basis of reasonable suspicion that the luggage contains narcotics. The Court concluded that the Fourth Amendment does not prohibit such a detention. *Id.* at 697-698.

In concluding that such a detention was not violative of the Fourth Amendment, the *Place* Court stated:

> In sum, we conclude that the when an officer's observations lead him reasonably to believe that a traveler is carrying luggage that contains narcotics, the principles of *Terry* and its progeny would permit the officer to detain the luggage briefly to investigate the circumstances that arouse his suspicion, provided that the investigative detention is properly limited in scope. [*Id.* at 706.]

See also *Rice, supra* at 517-519.

In the instant case, where defendant nervously deplaned at Detroit Metropolitan Airport, the officers were justified in reasonably suspecting the information they received that defendant was involved in drug trafficking could be valid.[9] That defendant was observed carrying two pieces of luggage after merely an overnight stay in a reputed source city for drugs also supported the officers' suspicions. Defendant's demeanor during the traffic stop simply added to the officers' already reasonable suspicion that defendant's luggage and vehicle contained contraband, and the subsequent detention based on these suspicions to await the arrival of the narcotics canine was appropriate.

In this regard, we note that the United States Court of Appeals for the Tenth Circuit reached a similar conclusion in *Williams*. There, the defendant argued that the officer did not have reasonable suspicion to detain him while awaiting the arrival of a canine unit after being stopped for a speeding violation. *Williams, supra* at 1267-1268. However, in finding that reasonable suspicion was present, the court cited as justification for the detention evidence that the defendant was extremely nervous throughout the traffic stop, was driving a car that had been rented in a known source city for drugs, and told the officer he was traveling from a city different from the city in which the car had been rented. *Id.* at 1269-1270. Similarly, the evidence in this case established that defendant had just returned from an overnight trip to a

---

[9] For example, in *Andrews, supra* at 566, the Court upheld the officers' decision to execute an investigatory stop of the defendant solely on the basis of information obtained from an uncorroborated anonymous tip.

reputed source city for drugs, lied to Officer Phelps regarding his travel plans, and was extremely nervous throughout the duration of the traffic stop.

### V. CONCLUSION

We hold that the brief detention of defendant between the conclusion of the traffic stop of defendant for operating his vehicle with an expired license plate and the arrival on the scene of the trained narcotics detection canine was supported by the officers' reasonable, articulable suspicion that defendant was involved in criminal activity (i.e., drug trafficking). Accordingly, the trial court erred in suppressing the evidence against defendant and dismissing the case.

Reversed and remanded for further proceedings consistent with this opinion. We do not retain jurisdiction.[10]

---

[10] Although the prosecutor also asserts that after the canine alert the officers had probable cause to search defendant's vehicle, the trial court did not rule on this precise question. We therefore decline to address the propriety of the vehicle search.