*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

QUINTON JABIRI-DAKARAI LARRY,

Defendant-Appellant.

UNPUBLISHED
April 18, 2025
12:52 PM

No. 363913
Genesee Circuit Court
LC No. 21-047785-FC

Before: MALDONADO, P.J., and CAMERON and YOUNG, JJ.

PER CURIAM.

Defendant appeals by right his jury trial convictions of second-degree murder, MCL 750.317, and possession of a firearm during the commission of a felony (felony-firearm), MCL 750.227b. Defendant was sentenced to serve 525 to 795 months' imprisonment for second-degree murder and 2 years' imprisonment for felony-firearm, to be served consecutively. We affirm.

## I. BACKGROUND

On August 22, 2020, Tristan Smith was murdered during a large block party outside of Rube's Bar in Flint.

On the night in question, Shamika Littlejohn was at the party with several family members, including her sister Rita Littlejohn. At the time, Shamika was dating a man named Robert Hare, who went by "Pobert." Pobert was at the party with numerous people, including defendant and Devon Johnson. Shamika was approached by the father of her child, a man named Jarquise, and the two engaged in a tense argument. The argument ended with Jarquise punching Shamika multiple times, at which point Pobert intervened. While the confrontation never became physical, Jarquise and Pobert engaged in a heated argument. This argument ended when Devon Johnson and defendant began shooting at Jarquise. Jarquise escaped unscathed, but Tristan Smith and Willie Cummings were each hit with stray bullets. Cummings made a full recovery, but Smith was killed.

The police struggled to convince anyone to cooperate with the investigation. None of the hundreds of people present during the shooting were willing to give a statement. Only one of the

-1-

adjacent buildings provided police with security footage; however, the footage provided ultimately was not helpful due to its distance from the shooting. Police eventually contacted Rita Littlejohn, who provided a Facebook picture that someone sent her. The picture included the two people who purportedly fired guns that night; these two people were identified as Devon Johnson and defendant. Police obtained a search warrant for defendant's house, and they found a gun in defendant's blue Chevrolet Malibu which was parked in the street in front of the house. Subsequently, a forensic analyst determined that the bullet removed from Tristan Smith's body during the autopsy matched the gun found in defendant's car.

The key witnesses at defendant's trial were Rita Littlejohn, Devon Johnson, and a firearm and toolmarks expert. Rita explained that she recognized the shooter from a Facebook picture someone sent her, and she was confident that the person in the photo was the shooter. It is undisputed that the person in this photograph was defendant. When asked in court, Rita maintained confidence that the person in the photograph was the shooter, but she was not certain that defendant was the person in the photograph. Defendant was wearing a medical walking boot at the time of the shooting, and when asked why she did not reveal this to the police when she initially spoke with them, Rita indicated that she simply had not remembered. Devon Johnson admitted to his role in the shooting and testified that defendant was the other shooter. However, Johnson did not divulge this information until he was offered a remarkable plea agreement in exchange for his testimony. Johnson was initially charged with first-degree murder, AWIM, and two counts of felony firearm. In exchange for his testimony, each of these counts was dismissed, and he instead pleaded guilty to assault with intent to do great bodily harm less than murder, MCL 750.84, and a corresponding charge of felony-firearm. This deal included a two-year sentencing agreement, and rather than facing life in prison, Johnson was released within 48 hours of entering his plea. The firearm and toolmarks expert explained that the bullet taken from Smith's body matched defendant's gun.

Defendant's strategy at trial was to attack the credibility of the eyewitnesses, attack the quality and thoroughness of the investigation, and put the blame squarely on Quay Johnson— Devon Johnson's brother. Devon Johnson's testimony was thoroughly impeached on the basis of his plea agreement, the time it took to offer his statement, and his failure to comply with all of the terms of the plea agreement. Rita Littlejohn was impeached regarding her failure to report the shooter's walking boot as well as her initial statement that she saw a man with dreadlocks holding a gun. Defendant's grandmother testified that Quay Johnson—who had dreadlocks—regularly drove defendant's car, thereby gaining access to defendant's gun. During closing arguments, defense counsel emphasized that the police failed to get statements from any of the hundreds of people present when the shooting occurred, only obtained security footage from one of the adjacent businesses, and failed to ever contact Jarquise or Pobert.

Defendant was found guilty of second-degree murder, and he subsequently filed a motion for a new trial, raising largely the same arguments as brought in this appeal. The court ordered an evidentiary hearing to consider defendant's argument that defense counsel should have consulted a counter expert to refute the prosecution's evidence that the bullet matched defendant's gun. Defense counsel testified that he discussed the matter with defendant, and the two decided that the superior strategy was to cast doubt on whether the shooter was him or Quay. The hearing became contentious when defendant offered expert testimony because the prosecution was adamant that the proposed expert was not qualified to opine on firearm identification. The court, ultimately

qualified the witness. However, the judge expressed skepticism about whether she would have qualified the witness if he were to testify before a jury. The witness testified that it is not actually possible to definitively match bullets and casings to guns, but the court nonetheless denied defendant's motion for a new trial.

## II. INEFFECTIVE ASSISTANCE OF COUNSEL

Defendant raises multiple arguments asserting ineffective assistance of counsel, each of which is without merit.

## A. STANDARDS OF REVIEW AND GOVERNING LAW

Claims of ineffective assistance of counsel present mixed questions of fact and law. *People v Head*, 323 Mich App 526, 539; 917 NW2d 752 (2018). Factual findings are reviewed for clear error and legal conclusions are reviewed de novo. *Id*. "To prevail on a claim of ineffective assistance, a defendant must, at a minimum, show that (1) counsel's performance was below an objective standard of reasonableness and (2) a reasonable probability exists that the outcome of the proceeding would have been different but for trial counsel's errors." *Id*. (quotation marks, citation, and alteration omitted). "[A] reasonable probability is a probability sufficient to undermine confidence in the outcome." *People v Randolph*, 502 Mich 1, 9; 917 NW2d 249 (2018). This Court presumes counsel was effective, and defendant carries a heavy burden to overcome this presumption. *Head*, 323 Mich App at 539.

"A convicted defendant making a claim of ineffective assistance must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment." *Strickland v Washington*, 466 US 668, 690; 104 S Ct 2052; 80 L Ed2d 674 (1984). This Court then evaluates "whether the trial attorney's acts or omissions were outside the wide range of professionally competent assistance." *People v Green*, 322 Mich App 676, 684; 913 NW2d 385 (2018) (quotation marks and citation omitted). "This Court does not second-guess counsel on matters of trial strategy, nor does it assess counsel's competence with the benefit of hindsight." *People v Traver (On Remand)*, 328 Mich App 418, 422-423; 937 NW2d 398 (2019) (quotation marks and citation omitted). "Decisions regarding what evidence to present, whether to call witnesses, and how to question witnesses are presumed to be matters of trial strategy." *People v Horn*, 279 Mich App 31, 39; 755 NW2d 212 (2008). However, "a court cannot insulate the review of counsel's performance by calling it trial strategy." *People v Trakhtenberg*, 493 Mich 38, 52; 826 NW2d 136 (2012). Moreover, "a sound defense strategy cannot follow an incomplete investigation of the case when the decision to forgo further investigation was not supported by reasonable professional judgment." *Id*. at 55.

## B.  FIREARM IDENTIFICATION

Defendant argues that defense counsel should have sought a *Daubert*[1] hearing to challenge the prosecution's firearm and toolmarks expert.  Alternatively, defendant argues that defense counsel should have presented a counter expert.  We disagree with both arguments.

## 1.  ADMISSIBILITY OF EXPERT TESTIMONY

A request for a *Daubert* hearing to test the admissibility of the prosecution's expert witness would have been meritless because firearm identification has been widely used and accepted for decades.  See *United States v Brown*, 973 F3d 667, 705 (CA 7).

Defendant argues that trial counsel rendered ineffective assistance by failing to request a *Daubert* hearing regarding the prosecution's firearm identification expert.  Admissibility of expert testimony is governed by MRE 702, which, at the time of defendant's trial, provided:

> If the court determines that recognized scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise if (1) the testimony is based on sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

MRE 702 "incorporates the standards of reliability that the United States Supreme Court established in *Daubert*," and "[a] '*Daubert* hearing' is simply an evidentiary hearing . . . to make the threshold determination that the trier of fact is not called on to rely in whole or in part on an expert opinion that is only masquerading as science."  *People v Spaulding*, 332 Mich App 638, 658; 957 NW2d 843 (2020) (quotation marks and citation omitted).

> The courts are not in the business of resolving scientific disputes.  The only proper role of a trial court at a *Daubert* hearing is to filter out expert evidence that is unreliable, not to admit only evidence that is unassailable.  The inquiry is not into whether an expert's opinion is necessarily correct or universally accepted.  The inquiry is into whether the opinion is rationally derived from a sound foundation. [*Chapin v A & L Parts, Inc*, 274 Mich App 122, 139; 732 NW2d 578 (2007).]

"Expert testimony may be excluded when it is based on assumptions that do not comport with the established facts or when it is derived from unreliable and untrustworthy scientific data."  *People v Dobek*, 274 Mich App 58, 94; 732 NW2d 546 (2007).

We find persuasive a case from the United States Court of Appeals for the Seventh Circuit.  See *Brown*, 973 F3d at 702-705.  In *Brown*, the defendants argued that the trial court improperly admitted expert testimony that toolmarks analysis can "be used to determine whether two bullets or casings were fired from the same firearm."  *Id*. at 702.  The expert testimony presented in *Brown*

---

[1] *Daubert v Merrell Dow Pharm, Inc*, 509 US 579; 113 S Ct 2786; 125 L Ed 2d 469 (1993).

largely mirrored the testimony that was provided in the present case. *Id*. at 702-703. According to the defendants in *Brown*, the "premise underlying the field of firearms analysis—that no two firearms will produce the same microscopic features on bullets and cartridge cases—is, at best, an unproven hypothesis." *Id*. at 703 (quotation marks and alteration omitted). The Seventh Circuit determined that the defendants' argument had "respectable grounding." *Id*. The court cited "a report issued by the President's Council of Advisors on Science and Technology (PCAST)" that noted concerns about the fact that there was only one "independent black box stud[y]" that was able to "estimate the reliability of firearms analysis . . . ." *Id*. "Ultimately, the PCAST report found that firearms analysis fell short of the criteria for foundational validity." *Id*. (quotation marks and alteration omitted). Nevertheless, the court deferred to the trial court's decision to admit the evidence because the methodology of the Association of Firearms and Toolmark Examiners (AFTE) "had been almost uniformly accepted by federal courts," the AFTE's methodology "has been tested and subjected to peer review," and because the relevant studies have consistently yielded low rates of error. *Id*. at 704.[2]

At this juncture, we can discern no basis upon which a court could find firearm identification evidence so unreliable as to be inadmissible. As explained in *Brown*, this science has been widely used and accepted for decades. See *People v Spaulding*, 332 Mich App 638, 659; 957 NW2d 843 (2020) (stating in a different context that the defendant would not have been entitled to a *Daubert* hearing because the expert testimony was based on "a recognized discipline" (quotation marks and citation omitted)). There does not seem to be any Michigan caselaw that addresses excluding this type of evidence, and "[d]efense counsel cannot be deemed deficient for failing to advance a novel legal argument." *People v Crews*, 299 Mich App 381, 400; 829 NW2d 898 (2013) (quotation marks and citation omitted). Simply put, excluding firearm match testimony on the basis of the unreliability of its underlying methods would be unprecedented, and defense counsel would have been asking the court to venture into uncharted waters. Declining to make such a request cannot be described as an unprofessional error.

## 2. COUNTER EXPERT

Defense counsel's decision not to call a counter expert to challenge the validity of the prosecution's firearm identification evidence was a sound exercise of trial strategy. Defense counsel made a reasonable strategic choice to instead attack the quality of the police investigation while raising the possibility that Quay Johnson was the shooter. Calling a counter expert to cast doubt on whether defendant's gun was the murder weapon would have undercut this strategy. Moreover, defendant has not established that this choice of strategy was the result of an incomplete investigation.

---

[2] Also notable is a concurring opinion written by Chief Justice McCormack and joined by Justice Bernstein in a case in which the Supreme Court denied an application for leave to appeal. See *People v McAdoo*, 497 Mich 975; 859 NW2d 711 (2015) (McCormack, C.J., concurring). In that opinion, Justice McCormack wanted "to note [her] unease with the expert testimony regarding the toolmark evidence offered by the prosecution" because "significant doubt has been cast on the reliability and scientific foundation of that evidence." *Id*. While notable, this opinion is not binding.

Counsel's decisions regarding the choice of theories to present are presumed to be sound exercises of trial strategy, see *People v Davis*, 250 Mich App 357, 368; 649 NW2d 94 (2002), and the record in this case supports that presumption. Regarding the police investigation, there appeared to be hundreds of people at the block party when the shooting occurred, but the police could not get anybody to give a statement. Further, while there were numerous businesses in the vicinity of the shooting, the police were only able to get one business to supply any security footage. Additionally, as defense counsel emphasized during closing arguments, the police never successfully contacted Pobert, Quay, or Jarquise despite the central roles they played in the shooting. Given this record, attacking the investigation made sense as a central strategy.

The record also supported the defense's suggestion that Quay Johnson might have been the true shooter. First and foremost, the prosecution's DNA expert testified that she could not ascertain whether defendant's DNA was on the murder weapon because at least five different people contributed DNA to the sample taken from the gun. Thus, the prosecution's evidence definitively established that, despite being found in defendant's car, numerous people had access to and handled the gun. Defense counsel then established that Quay Johnson was one of the people who could access the gun by offering testimony from defendant's grandmother that Quay regularly used defendant's car, sometimes without defendant being present. Additionally, Quay had dreadlocks, and defense counsel emphasized that a man with dreadlocks was reportedly seen with a gun. Because Quay was Devon Johnson's brother, Devon had a clear motive to blame the shooting on defendant instead of Quay. Finally, defense counsel testified at the *Ginther* hearing that he discussed the matter with defendant prior to trial, and the two jointly decided to pursue this strategy. Notably, defense counsel testified that defendant told him there was no reason to doubt that the gun found in his car was the murder weapon. Casting doubt on whether the gun found in defendant's car was the murder weapon would simultaneously cast doubt on whether Quay was the actual shooter, so it was a reasonable choice for defense counsel to shy away from this approach.

Finally, defendant argues that this Court should not defer to defense counsel's choice of strategy because he failed to investigate the possibility of presenting a counter expert. However, defense counsel indicated that he had researched the validity of the firearm and toolmarks field for past cases and reached the conclusion that it was a valid, widely accepted science. Defense counsel also testified that his decision not to seek out a counter expert was based in part on consultations with firearm and toolmarks experts in past cases. Also, to reiterate, the record suggests that attempting to pin the shooting on Quay was the superior strategy in this case.

In conclusion, defendant has failed to establish ineffective assistance of counsel arising from defense counsel's decision not to pursue a counter expert to rebut the prosecution's firearm and toolmarks testimony.

C. MOTION TO SUPPRESS

Defendant argues that defense counsel should have sought suppression of the murder weapon based on lack of probable cause to search defendant's car. We disagree.

Prior to trial, defense counsel unsuccessfully sought suppression of the murder weapon, arguing that it was found during an impermissible inventory search. On appeal, defendant argues

that defense counsel should have also argued that suppression was warranted because the search warrant affidavit did not establish probable cause. "Generally, seizures are reasonable for purposes of the Fourth Amendment only if based on probable cause." *People v Lewis*, 251 Mich App 58, 69; 649 NW2d 792 (2002) (citations omitted). With limited exceptions, the exclusionary rule bars admission of evidence that was obtained during an unreasonable search. *People v Hawkins*, 468 Mich 488, 498-499; 68 NW2d 602 (2003).

"A magistrate shall only issue a search warrant when he or she finds that there is a fair probability that contraband or evidence of a crime will be found in a particular place." *People v Franklin*, 500 Mich 92, 101; 894 NW2d 561 (2017) (quotation marks and citation omitted). "Probable cause to search exists when facts and circumstances warrant a reasonably prudent person to believe that a crime has been committed and that the evidence sought will be found in a stated place." *People v Mullen*, 282 Mich App 14, 27; 762 NW2d 170 (2008) (quotation marks and citation omitted). This determination hinges on the information available at the time. *Id.* "A magistrate's finding of probable cause and his or her decision to issue a search warrant should be given great deference and only disturbed in limited circumstances." *Franklin*, 500 Mich at 101. Thus, reviewing courts "ask only whether a reasonably cautious person could have concluded that there was a substantial basis for the finding of probable cause." *People v Russo*, 439 Mich 584, 603; 487 NW2d 698 (1992) (quotation marks and citation omitted). The purpose of this deference is "to emphasize the magistrate's role as an independent judicial officer and to encourage law enforcement officers to secure warrants." *Franklin*, 500 Mich at 101. When "reviewing a magistrate's decision to issue a search warrant, this Court must evaluate the search warrant and underlying affidavit in a common-sense and realistic manner." *People v Darwich*, 226 Mich App 635, 636-637; 575 NW2d 44 (1997).

Regarding probable cause to believe that defendant was the shooter and that evidence would be found at his home, the warrant's affidavit provided in relevant part:

6. That Affiant and D/Tpr. Lukco interviewed a witness identified as Rita Littlejohn on 08/04/2020. Rita advised Affiant she was near Rube's Bar . . . with several of her sisters when she heard a gunshot very close to her location. Rita told Affiant she looked toward the sound of the gunshot and observed a black male wearing a purple shirt with purple and black Nike shoes shooting a firearm multiple times in the direction of the crowd of people where she was standing, including Tristan Smith.

7. That on 08/24/2020, Rita provided Affiant a photograph of six black males she obtained from the Facebook page of "Pobert Marley". [sic] Rita advised Affiant the black male wearing the pink shirt in the photograph was the black male she observed . . . shooting at the large crowd of people . . . . Rita advised affiant the black male in the photograph she provided was named Devon. Rita advised she observed the black male wearing the purple shirt hanging out with "Pobert Marley" at the scene prior to the shooting.

\* \* \*

11. That on 08/24/2020, Rita Littlejohn provided an additional photograph obtained from Facebook of a black male with [defendant's name] written at the bottom of the photograph. Rita advised Affiant she was told the male was also involved in the homicide of Tristan Smith and shooting of Willie Cummings.

12. That Affiant confirmed the male in the photograph provided by Rita Littlejohn was [defendant] via SNAP.

* * *

14. That on 08/24/2020, Affiant was contacted by Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) Special Agent Jonathan Wickwire advising an anonymous ATF Source of Information (SOI) informed the ATF that [defendant] was the individual who killed [sic] recently killed the man at Rube's Bar.

15. That [Wickwire] advised Affiant that an [SOI] has provided information that [defendant] was driving a blue in color Chevrolet Malibu and that he is on Barth Street all the time. The SOI advised that [defendant] is always armed with a firearm and that there is an AR15 in the trunk of the blue Chevrolet Malibu. The SOI has contacted ATF numerous times to advise that [defendant] and other subjects were at the Barth Street address with firearms.

16. That on June 10, 2020, [two ATF agents] were in the area of 2815 Barth Street, Flint, Michigan, when they observed a blue in color Chevrolet Malibu parked in the driveway. Agents have continued to monitor the address and have observed the vehicle mentioned above at the location on several occasions.

17. That on 08/26/2020, Affiant observed a blue Chevrolet Malibu bearing Michigan registration plate EGL1510 parked in front of [defendant's address]. A LEIN/SOS check showed the blue Chevrolet Malibu was registered to [defendant].

* * *

19. Based on your Affiant's training and experience your affiant knows that people who commit criminal activity such as that described above involving inflicting injury and death through the use of firearms most often conceal or dispose of weapons used and clothing worn . . . at locations where they associate or reside.

When describing the places where evidence was likely to be found, the affidavit included "vehicles and/or persons coming to and exiting from" defendant's address.

"A search warrant may be issued on the basis of an affidavit that contains hearsay." *People v Harris*, 191 Mich App 422, 425; 479 NW2d 6 (1991). When an affidavit is based on information obtained from an unnamed source, it must contain "affirmative allegations from which the judge or district magistrate may conclude that the person spoke with personal knowledge of the information and either that the unnamed person is credible or that the information is reliable." MCL 780.653(b). The purpose of this rule is "to eliminate the use of rumors or reputations to form

-8-

the basis for the circumstances requiring a search." *People v Stumpf*, 196 Mich App 218, 223; 492 NW2d 795 (1992). This "element should be derived from the information provided or material facts, not merely a recitation of the informant's having personal knowledge. If personal knowledge can be inferred from the stated facts, that is sufficient to find that the informant spoke with personal knowledge." *Id*. (citation omitted) "[T]he specificity of the details provided by the informant" can support a finding of personal knowledge. *Id*. Conducting an investigation that corroborates the information and past success, relying on the particular informant, can also support the veracity of an informant. *Id*.

We conclude that when the affidavit is viewed with all deference due to the magistrate's finding, it provided a substantial basis for a finding of probable cause. As noted, "the specificity of the details" can support an inference of personal knowledge, *Stumpf*, 196 Mich App at 223, and the informant provided a number of specific details. These details included: defendant's name, the car defendant owned, defendant's regular presence on Barth Street, and the presence of an AR 15 in defendant's trunk. To reiterate: the affidavit is assessed based on the knowledge available at the time, so it is immaterial that the police ultimately did not find an AR 15 in defendant's truck. *Mullen*, 282 Mich App at 27. Additionally, while not leading to successful investigations, the informant had contacted ATF multiple times to report that defendant and others had guns on Barth Street. Furthermore, the informant's statements regarding defendant's blue Malibu and its regular presence on Barth Street were verified prior to obtaining the search warrant. Finally, while Rita Littlejohn's statement that someone told her defendant was the shooter is of little import on its own, the fact that there was someone else who was claiming that defendant was the shooter bolsters the veracity of the informant. As noted, probable cause is based on the totality of the circumstances, *Darwich*, 226 Mich App at 637, and search warrant affidavits can be supported by hearsay, *Harris*, 191 Mich App at 425.

Affirmed.

/s/ Allie Greenleaf Maldonado
/s/ Thomas C. Cameron
/s/ Adrienne N. Young