# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

LESLIE ELIJAH MALONE, JR.,

        Defendant-Appellant.

UNPUBLISHED
October 4, 2016

No. 329989
Berrien Circuit Court
LC No. 2014-005002-FH

Before: MURRAY, P.J., and HOEKSTRA and BECKERING, JJ.

PER CURIAM.

Defendant, Leslie Elijah Malone, Jr., entered a conditional guilty plea to one count of possession with intent to deliver 50 grams or more, but less than 450 grams, of cocaine, MCL 333.7401(2)(a)(*iii*). He appeals the trial court's order denying his motion to suppress evidence that he argues was unconstitutionally obtained when a police officer detained him longer than necessary following a traffic stop in order to conduct a canine sniff. Specifically, defendant contends that the officer did not have reasonable suspicion supported by articulable facts—as opposed to an unparticularized hunch—that criminal activity may be afoot in order to justify the extended detention. Defendant also contends that the canine sniff was executed illegally because the officer allowed the dog to enter the vehicle. Defendant unsuccessfully attempted to appeal the issue before this court, and we denied both his interlocutory application for leave[1] and his post-plea application for leave.[2] Defendant filed an application for leave to appeal to our Supreme Court, which remanded the matter to this Court for consideration as on leave granted, *People v Malone, Jr.*, 499 Mich 913; 877 NW2d 884 (2016). On plenary consideration, we reverse the trial court's ruling with respect to defendant's motion to suppress and remand for further proceedings.

---

[1] *People v Malone, Jr.*, unpublished order of the Court of Appeals, entered August 21, 2015 (Docket No. 328080).

[2] *People v Malone, Jr.*, unpublished order of the Court of Appeals, entered December 18, 2015 (Docket No. 329989).

## I. PERTINENT EVIDENCE AND PROCEDURAL HISTORY

On Friday, December 5, 2014, Michigan State Police Trooper John Moore was on traffic patrol in Berrien County. He testified at defendant's preliminary examination that while on patrol, he observed a white[3] Hundai sedan traveling in accordance with applicable traffic laws, but with tinted side windows, which is a civil infraction, so Moore initiated a traffic stop. Moore later determined that defendant was the driver and Dennis Lee Outlaw, Jr., was the only passenger.

### A. OFFICER MOORE BODY CAMERA VIDEO FOOTAGE

Video footage from Moore's body camera indicates that he pulled defendant over at 1:43 p.m.[4] Moore approached the passenger side of the vehicle and Outlaw rolled down his window. Moore asked defendant and Outlaw if they knew why he stopped them. Defendant stated that he did not know, and Outlaw guessed that it was the window tinting. Moore confirmed that he had stopped them due to the window tinting, explained that it was not allowed in Michigan, and relatively quickly thereafter told defendant that he was not going to give him a ticket. He then asked defendant where he was headed to and where he was coming from. Defendant stated that he was headed to Benton Harbor and coming from the casino, where he had dropped off a relative for work. Moore requested defendant's and Outlaw's driver's licenses and the vehicle registration, which they provided. Moore stated that he was only going to issue a "verbal warning" for the tinted windows. Upon looking at the driver's licenses he had procured, Moore asked Outlaw if he had any relatives in Cass County, and Outlaw identified a relative there named Roger. Moore then said, "hang tight for one second," and he returned to his patrol car by 1:44 p.m. Thus, the extent of the interchange lasted approximately one minute.

For the next 17 minutes, Moore remained in his patrol car while defendant and Outlaw waited in their car for Moore to return.[5]

At 2:00 p.m., Moore exited his patrol car and approached the driver's side of the car occupied by defendant and Outlaw. Moore instructed defendant to exit the vehicle. Defendant complied and stepped out of the car. Moore instructed him to walk to the back of the car. Defendant complied. Moore asked defendant whether he was in possession of anything that

---

[3] Defendant was actually driving a silver car.

[4] The video appears to record every other second. While most of the dialogue is discernable, some of it is harder to understand. Defendant admitted the body camera video into evidence, without objection, at the motion to suppress hearing.

[5] As discussed in more detail below, Moore testified that he looked up defendant and Outlaw in his database and found no warrants for their arrest. He also determined that defendant possessed a valid driver's license. There is no indication in the record that there was any problem with the vehicle's registration or that the owner of the car had not given defendant permission to drive it.

Moore should be worried about, such as weapons. Defendant indicated that he was not. Moore asked if he could search defendant. Defendant consented willingly, raising his arms and allowing Moore to frisk him. Moore found nothing. Moore again asked defendant where he was coming from, with defendant confirming that it was from the casino, and he was dropping off his aunt there. When Moore asked if defendant's aunt worked for the casino, defendant explained that she was gambling. Moore asked defendant if he lived with his aunt, or was instead just borrowing her car (Moore assumed that the third-party who owned the car must be his aunt); defendant indicated that he was just borrowing the car. Moore told defendant that when he looked up defendant's name in his database, the results led him to believe that defendant had been in prison at one time, and defendant confirmed that he had. Moore asked why, and defendant explained that it was due to a firearm. Moore asked defendant if he had any firearms in the car, and defendant stated that he did not. Moore asked defendant how well he knew Outlaw, and defendant explained that Outlaw was his cousin. Moore asked defendant whether there was anything illegal in the car, such as narcotics or weapons. Defendant said there was nothing in the car. Moore asked again defendant to confirm whether he had just used the car to drop off his aunt and was heading home, and defendant indicated that was correct.

Moore then asked defendant if he had any problem with Moore looking inside the car. Defendant explained that he was in a rush and he had to get back. Moore asked again if he could look inside the car, and defendant said that he had to go. It was at this moment that Moore decided to detain defendant and order a K9 dog sniff.

After defendant twice politely declined Moore's request to search the car, Moore advised defendant that he needed to "hang tight for a second," as he was going to have a canine run around the car "if you don't want me to look in it" and that if it was clear, "we should be all set." Moore did not let defendant return to the car. During this interchange with defendant, Moore's body camera video does not reveal any observable signs of nervousness from defendant, although the footage does not show defendant's entire person. Moore's conversation with defendant ended at 2:02 p.m.

Moore approached the passenger side of the car, opened the passenger door, and instructed Outlaw to step outside. Outlaw complied. Moore asked him if he had anything Moore needed to know about. Outlaw said no. Moore asked if he could search Outlaw. Outlaw consented willingly, raising his arms and allowing Moore to frisk him. Moore found nothing. He confirmed with Outlaw that defendant was his cousin. Moore informed Outlaw that he had asked defendant if he had any weapons or narcotics in the car and that defendant had said no, but that defendant had declined to allow him to search the car, so Moore asked Outlaw if either he or defendant had anything in the car. Outlaw said no. Moore then advised Outlaw that he had ordered a dog sniff, and that if the dog "hit" on the car, he was going to search it, otherwise, they could leave. Outlaw politely requested Moore's business card, stating that he would need to explain to his boss why he was late for work. Moore asked Outlaw if he was on parole or probation, and Outlaw said no. Moore asked Outlaw if there was anything in the car that was his, and Outlaw said no, they were just dropping his mom (defendant's aunt) off at work and that his cousin (defendant) was then dropping him off. Outlaw indicated that the car was defendant's friend's car.

Moore did not let Outlaw back into the car. Outlaw asked if he could obtain his hat from the back seat while waiting, so Moore opened the back passenger door and retrieved Outlaw's hat, with Moore opening and closing the back passenger door. Although the videotape shows that it was Moore who opened the front passenger door when instructing Outlaw to exit the car, and who opened and closed the back passenger door in order to get Outlaw's hat out for him, it does not show who handled the front passenger door after Moore ordered Outlaw out of the car. However, at Moore's instruction, Outlaw can be seen walking away from the car to where Moore ordered defendant to stand, and the car door has been left fully open by Moore at that time. During Moore's interchange with Outlaw, Moore's body camera video does not reveal any observable signs of nervousness from Outlaw, although the footage does not show Outlaw's entire person. Moore's interaction with Outlaw ended at 2:04 p.m.

Moore detained defendant and Outlaw while awaiting arrival of the K9 Unit. At 2:24 p.m., 41 minutes after Moore initially pulled defendant over, police officer and K9 handler John Aaron Hopkins approached defendant's car with Elmo, a German Shepherd, and began a walk-around procedure. After the walk-around, Hopkins gave Moore a thumbs up, and an extensive search of defendant's car by three officers ensued. They found nothing in the interior of the car. During the search of the interior, Moore can twice be heard on the video remarking that it "*doesn't smell at all.*" The officers found nothing in the trunk. An officer then proceeded to search the engine compartment underneath the hood. At 2:32 p.m., after seven minutes of searching the vehicle, an officer found a plastic bag in the engine air filter underneath the hood of the car, which was then cut open, revealing what was later determined to be cocaine. The bags' interior plastic baggies were wrapped in dryer sheets.

## B. TESTIMONY OF OFFICERS MOORE AND HOPKINS

On May 12, 2015, at the suppression hearing, defendant's counsel called Moore as a witness. It is clear from the outset that Moore had not watched the videotape (at least recently) of his stop, as he did not recall several details of the event that are clearly depicted on the video. For example, he did not recall whether he told defendant after pulling him over and speaking through the passenger window that he would not be issuing a ticket, only giving him a verbal warning. Moore did recall that after returning to his patrol car with defendant's and Outlaw's driver's licenses, he checked his database[6] and found that there were no warrants for either of them. He also verified that defendant had a valid driver's license. Moore testified, however, that defendant and Outlaw had "officer safety precautions." When asked to explain what that meant, Moore indicated that it was "um, just - - just prior history," being "in a nutshell narcotics and also possibly another agency might be looking into them for the same activity." He elaborated no further. This prior history, Moore explained, is the reason why he did not "just let them go" after finding defendant had a valid driver's license and neither had any warrants for their arrest.

---

[6] Moore did not describe what he searched when checking for any problems associated with defendant or Outlaw, but in context, it is clear he was talking about having used the Law Enforcement Information Network (LEIN) system.

Moore testified that he followed up with defendant about his database finding, wherein they discussed a prior weapons and/or drugs charge. Moore confirmed that defendant willingly stepped out of the car and voluntarily submitted to a pat down. Moore recalled asking defendant to consent to a search of the car, at which point defendant said no, and Moore did not recall whether he told defendant before or after talking to Outlaw that he was going to get a K9 to do a walk-around and drug sniff. Moore admitted, however, that he had decided to do a dog sniff after defendant declined to let him search the car. He also admitted that he had detained defendant and Outlaw pending the dog sniff, and they were not free to leave.

Moore testified that the factors he used in making his decision to detain defendant and order a K9 walk-around were that "initially upon my contact with the occupants um, they both, um were very quiet, sitting still, low in the seats and typically - - um, I knew that raised - - raised some - - some red flags that they might be hiding something." He deemed their explanations about their travel plans to be conflicting, because working is not the same as gambling. He also took into consideration that it was a third-party vehicle. Further, although Moore can twice be heard on his body camera video while searching the interior of the car stating that "*it doesn't smell at all*," he testified at the suppression hearing that "the condition of the interior of the vehicle was the strong odor of a masking scent, overwhelming fragrant scent omitting [sic?] from the vehicle." "All of that put together on top of the information that I got from the officer safety precaution"[7] he testified, "lead me to believe from my training and experience that something was not right." He also testified that his gut instinct added to the basis of his sense of suspicion.[8]

On cross-examination, Moore admitted that in his report of the incident, written after the incident and on the day that it happened, he did not indicate anywhere that there was a strong masking odor or overwhelming fresh fragrance, only that the car's interior was well kept and had a fresh odor.

---

[7] As noted above, Moore explained that his "intel information" was "just prior history", being "in a nutshell narcotics and also possibly another agency might be looking into them for the same activity."

[8] Although not made a part of the evidence considered in defendant's motion to suppress, a transcript of Moore's testimony at defendant's preliminary examination reveals that Moore explained he "just had a feeling that something was not right," it struck him as "odd" that defendant's car was "extremely clean, [sic] wasn't, you know, dirt or debris laying about," "I asked Mr. Malone if I could search his vehicle, being that I was getting these strange vibes, and he denied my request," "[s]omething in the back of my mind was telling me, somethin's not right," "I mean, you could call it a hunch if you wanted to," "I would say, to me it was, intuition." He further explained that "I summoned a K9 to respond, to do a free air search, based on the fact that I was denied a consent search." Moore described the bag found inside the engine's air filter compartment underneath the hood as a "secured, heavy plastic, sealable bag. . . . real heavy." At the preliminary examination, Moore only described the car as having a "fresh odor." He said nothing about a strong odor or masking scent.

The prosecutor did not subpoena Hopkins, so the trial court took into account Hopkins' testimony from the preliminary examination, wherein Hopkins indicated that the front passenger door was open enough to allow the dog access to smell the inside of the vehicle, which is where the dog is said to have alerted to a positive scent.

After defense counsel made her argument regarding suppression, the trial court allowed the prosecutor to recall Moore for further testimony. On recall, Moore testified that his telling a driver he is not going to get a ticket for the reason he has been pulled over is a "technique" he uses in order to "see if their level of anxiety reduces; and in this case it did not. A lot of times people are um, a little nervous or a lot nervous . . . about getting a citation and that is one of the things I look for. Is that what they're nervous about or is it something else." When asked by defense counsel why he chose to use such technique on defendant, Moore simply responded that, "it's a technique," and that he had no reason for suspicion enough to call a K9 unit until "[a]fter I viewed the behavior and all the other things."

## C. ARGUMENT OF COUNSEL AND TRIAL COURT FINDINGS

At the suppression hearing, defense counsel argued that a nearly forty-minute detention after Moore indicated he was not going to give defendant a ticket and a LEIN check revealed no warrants and a valid driver's license was too long. According to defendant, there was no particularized reasonable suspicion, and nothing, even after the consented-to pat down following Moore's removal of defendant from the car, gave rise to a legal right to further detain these "two African Americans in a tinted car" for the time it took to effectuate a K9 "free air search" involving a walk around the car. Defendant also took issue with the fact that the dog put his nose inside the passenger car, which was not permissible. The prosecutor argued that there was reasonable suspicion based on the information that was gathered in light of the experience of the trooper. The prosecutor highlighted the alleged change in the reason for being at the casino, defendant having an "intentional" demeanor, being "very passive and very calm" and "very quiet and very assure of himself" which was interpreted as being "nervous," the fact that the vehicle was "extremely clean," and defendant's criminal history.

With regard to the length of the detention, the trial court queried, "[e]ven after he had no warrants, a pat down and there's no weapons, and the Defendant articulates a reasonable reason, had to get to work; had to get going. Um, 45 minutes you say is reasonable?" It was clarified that Outlaw was the one who had to get to work, and the prosecutor indicated that 40 to 45 minutes was reasonable. The trial court took the evidence and arguments under advisement.

A week after the suppression hearing, the trial court ruled that while it was "a very close call," the totality of the circumstances created a reasonable suspicion sufficient to detain defendant long enough to conduct a dog sniff. The trial court identified the following factors relied upon by Moore to prolong the traffic stop and order a canine sniff:

> (1) Defendant and the passenger were quiet and sat lowly—sat low in their seats
> when the trooper first approached; (2) Defendant initially said he was returning
> from dropping someone off at the casino to work, but changed his story to say he
> was dropping the person off to gamble when the trooper returned to the vehicle;
> (3) The vehicle was owned by a 3rd party; probably more significant, (4) An

-6-

officer safety caution was reported on LIEN, informing the trooper that Defendant may have been involved in criminal activity in the past; (5) the trooper received some prior history intelligence on Defendant and the passenger indicating that they may have been involved with trafficking narcotics or were under investigation from another agency; (6) The car was very clean inside and the fresh laundry smell; (7) The trooper still observed nervousness on the part of Defendant and the passenger after he told them that he was not going to issue them a ticket.

Factors the trial court found to "weigh very strongly in favor of finding reasonable suspicion" were Moore's characterization of defendant's behavior as "nervous," that defendant's and Outlaw's nervousness did not diminish after the trooper said he would not give them a ticket, and that defendant or Outlaw "may have a history related to trafficking narcotics."

The court also indicated, however, that it would not "hurt my feelings one bit - -" if defense counsel chose to seek an interlocutory appeal. Referring to what appeared to be the difficulty of its decision with regard to the suppression issue, the trial court noted, "it's probably as close as you can get," and followed up by stating, "[f]rankly," the "Court of Appeals is why I sleep at night." The trial court "very strongly" encouraged defense counsel to think about seeking an interlocutory appeal, saying "who knows what's going to happen here." Defendant entered a conditional plea and sought leave to appeal as described above, leading to our appellate review of the trial court's suppression ruling.

## II. ANALYSIS

We review a trial court's factual findings in a suppression hearing for clear error and affirm them unless "we are left with a definite and firm conviction that a mistake was made." *People v Lewis*, 251 Mich App 58, 67; 649 NW2d 792 (2002). However, because the trial court's "application of constitutional standards regarding searches and seizures to undisputed facts is entitled to less deference," we review de novo the trial court's ultimate ruling on the motion to suppress. *Id*. (citations omitted).

The Fourth Amendment of the United States Constitution protects the right against unreasonable searches and seizures. *People v Slaughter*, 489 Mich 302, 310; 803 NW2d 171 (2011). " '[T]he touchstone of the Fourth Amendment is reasonableness.' " *People v Williams*, 472 Mich 304, 314; 696 NW2d 636 (2005), quoting *Ohio v Robinette*, 519 US 33, 39; 117 S Ct 417; 136 L Ed 2d 347 (1996). "Reasonableness is measured by examining the totality of the circumstances" and "is a fact-intensive inquiry that does not lend itself to resolution through the application of bright-line rules." *Id*.

"Stopping an automobile and detaining its occupants constitutes a 'seizure' within the meaning of the Fourth Amendment, even if the purpose of the stop is limited and the resulting detention is brief." *People v Williams*, 236 Mich App 610, 612 n 1; 601 NW2d 138 (1999). Probable cause to believe that a traffic or equipment violation has occurred justifies a stop of a vehicle. See *People v Davis*, 250 Mich App 357, 363; 649 NW2d 94 (2002). Upon stopping a vehicle, a police officer may, as a matter of routine, detain the driver for a period sufficient to enable the officer to run a Law Enforcement Information Network (LIEN) check on the driver and the vehicle, *id*., at 364-368, and to enable the officer to ask reasonable questions concerning

the violation of law and its context, *Williams*, 472 Mich at 315.[9] "Authority for the seizure thus ends when tasks tied to the traffic infraction are—or reasonably should have been—completed." *Rodriguez v United States*, ___ US ___, ___; 135 S Ct 1609, 1614; 191 L Ed 2d 492 (2015).[10] If new circumstances are revealed, the officer may extend the detention long enough to resolve the suspicions raised. *Williams*, 472 Mich at 315.

There is no dispute in the case at bar that the initial traffic stop was properly occasioned by a civil infraction in the form of tinted windows on the car defendant was driving. At issue is whether Moore had a reasonable suspicion, based on articulable facts, to prolong the traffic stop beyond the time necessary to complete the purpose of the traffic stop in order to conduct the canine sniff. We conclude that he did not.

"[W]hether police routinely may extend an otherwise-completed traffic stop, absent reasonable suspicion, in order to conduct a dog sniff" was addressed by the Supreme Court in *Rodriguez*, 135 S Ct at 1614. Ultimately, the *Rodriguez* Court held "that a police stop exceeding the time needed to handle the matter for which the stop was made violates the Constitution's shield against unreasonable seizures" and that a "seizure justified only by a police-observed traffic violation, therefore, become[s] unlawful if it is prolonged beyond the time reasonably

---

[9] Notably, our Supreme Court in *Williams* held that in addition to asking for the necessary identification and paperwork, an officer "may also ask questions *relating to the reason for the stop*" and specifically, "*about the purpose and itinerary* of a driver's trip during the traffic stop *in order to determine whether a violation has taken place*, and if so, whether a citation or warning should be issued or an arrest made." *Williams*, 472 Mich at 316 (emphasis added, quotation marks and citations omitted). As such, an officer's questioning about the purpose and itinerary of the driver's trip is arguably only allowed if it is relevant to determining whether a violation has taken place. In the instant case, defendant's travel itinerary had nothing to with whether he had committed a civil infraction for tinted windows. Follow-up questions are implicitly permitted when "the initial answers given are suspicious." *Id.* It is unclear how defendant's initial answer that he was dropping off a relative at the casino for work was suspicious. But ultimately, as stated in *Williams*, the issue when evaluating a police detention and investigation is one of reasonableness in light of all the facts available to the officer. *Id.* at 316-317.

[10] This Court in *Davis* noted that

> in at least two [federal] circuits, the United States Court of Appeals has held that an officer conducting a routine traffic stop may run computer checks on the driver's license, the vehicle registration papers, and whether the driver has any warrants or the vehicle has been reported stolen. Once the computer check confirms the driver has produced a valid license and proof of entitlement to operate the car, the driver must be permitted to proceed on his way, without further delay by police for additional questioning. [*Davis*, 250 Mich App at 367 (quotation marks and citations omitted)].

required to complete th[e] mission of issuing a ticket for the violation." *Id.*, 135 S Ct at 1612 (quotation marks and citation omitted). The *Rodriguez* Court explained that, although police "may conduct certain unrelated checks during an otherwise lawful traffic stop[,]" they "may not do so in a way that prolongs the stop, absent the reasonable suspicion ordinarily demanded to justify detaining an individual." *Id.*

The reasonable suspicion sufficient to detain an individual "entails something more than an inchoate or unparticularized suspicion or 'hunch,' but less than the level of suspicion required for probable cause." *People v Champion*, 452 Mich 92, 98; 556 NW2d 498 (1996), citing *United States v Sokolow*, 490 US 1; 109 S Ct 1581; 104 L Ed 2d 1 (1989). In determining whether a police officer acted reasonably, "due weight must be given, not to his inchoate and unparticularized suspicion or 'hunch,' but to the specific reasonable inferences which he is entitled to draw from the facts in light of his experience." *Terry v Ohio*, 392 US 1, 27; 88 S Ct 1868; 20 L Ed 2d 889 (1968).[11] Requiring reasonable suspicion as a prerequisite to such seizures "protects an innocent person from being subjected to overbearing or harassing police conduct carried out solely on the basis of imprecise stereotypes of what criminals look like, or on the basis of irrelevant personal characteristics such as race." *United States v Sokolow*, 490 US 1, 12; 109 S Ct 1581; 104 L Ed 2d 1 (1989) (MARSHALL, J., dissenting) (quotation marks and citation omitted).

Our review of the relevant evidence in the case at bar convinces us that the trial court—which fairly deemed its decision "a very close call"—erred in denying defendant's motion to suppress based on its erroneous conclusion that reasonable suspicion supported Moore's prolongation of the traffic stop to conduct a canine sniff. Although Moore's testimony establishes that his intuition told him something was "not right," the evidence does not establish that his hunch ever rose to the level of reasonable suspicion. Our Supreme Court has clearly stated that "[a]n officer testifying that he inferred on the basis of his experience and training is obligated to articulate how the behavior he observed suggested, in light of his experience and training, an inference of criminal activity." *People v LoCicero (After Remand)*, 453 Mich 496, 505-506; 556 NW2d 498 (1996). Moore did not do this. He did not articulate what reasonable

---

[11] As summarized recently in this Court's opinion in *People v Dillon*, 296 Mich App 506; 822 NW2d 611 (2012) (citations omitted).

> [A] police officer may stop and detain a motor vehicle on the basis of an articulable and reasonable suspicion that the vehicle or one of its occupants is violating the law, including a law regulating equipment. This Court's determination of whether there was reasonable suspicion to justify a stop must be made on a case-by-case basis, evaluated under the totality of the circumstances, and based on common sense. The subjective intent of the police officer is irrelevant to the validity of the stop.
>
> A court is required to suppress evidence otherwise lawfully seized during a traffic stop only if the officer did not have reasonable suspicion to justify the stop.

At issue in the present case is whether the officer had a reasonable suspicion to justify detention beyond that permitted by the scope of the traffic infraction.

inferences he drew from the facts or what about his experience and training allowed him to infer from his observation of the circumstances surrounding the traffic stop that something was "not right." Rather than set forth reasonable inferences drawn from observations filtered through relevant specialized training and experience in law enforcement, Moore explicitly stated that one could call what he had a "hunch," and that he would call it "intuition." The fact that the trooper's hunch resulted in the seizure of contraband does not transform the hunch into reasonable suspicion. See *id*. at 501 ("The discovery of contraband does not validate an illegal search and seizure.").

Further, although the prosecution cites cases in which facts like those Moore testified he relied upon were included among others that, in totality, were deemed to create a reasonable suspicion, each of those cases also had several other significant or more compelling facts not present in this case.[12] As noted by our Supreme Court in *Williams*, because of "endless variations in the facts and circumstances implicating the Fourth Amendment," measuring reasonableness by examining the totality of the circumstances is a "fact-intensive inquiry that does not lend itself to resolution through the application of bright line rules." *Williams* 472, Mich at 314 (quotation marks and citation omitted).

In the instant case, the trial court found Moore's characterization of defendant's behavior as "nervous," and his implication that defendant's behavior did not change, to weigh heavily in its reasonable suspicion calculus. In some instances, nervousness can be a pertinent factor in determining reasonable suspicion. See *Lewis*, 251 Mich App at 70 (noting that "nervous, evasive" behavior is a pertinent factor in determining reasonable suspicion). Generally, however, nervousness is "an unreliable indicator [of illegal activity], especially in the context of a traffic stop," because many citizens become nervous when stopped by the police "even when they have nothing to hide or fear." *United States v Richardson*, 385 F3d 625, 630-631 (CA 6, 2004); *United States v Simpson*, 609 F3d 1140, 1148 (CA 10, 2010) (reiterating the court's consistent holdings that nervousness is "of limited significance" in determining whether reasonable suspicion exists) (quotation marks and citations omitted).[13] Further, unless an officer has prior knowledge of a person, "it is difficult, even for a skilled police officer, to evaluate whether a person is acting normally for them or nervously." *Simpson*, 609 F3d at 1148.

---

[12] See, e.g., *Flood v State*, 169 P3d 538, 545-548 (Wyo., 2007) (finding reasonable suspicion supported by defendant's obvious signs of extreme nervousness [i.e., refusal to make eye contact, fidgeting, and having trouble formulating answers], along with a strong odor of cologne in the vehicle, discrepancies between the passengers' accounts of their trip, and the short duration of their stay relative to the long roundtrip distance); *Goss*, 852 F Supp 2d 871, 886-888 (finding reasonable suspicion supported by third-party registration of the vehicle defendant was driving, along with defendant's utterly implausible recollection of the basketball games he and his colleagues attended, defendant's driving on a known drug highway, and inconsistencies in the passengers' answers to the trooper's questions suggestive of fabrication); *State v Lee*, 265 Neb 663, 669-674 (Neb, 2003) (finding reasonable suspicion supported by defendant's criminal history, along with her extreme nervousness, her divergent stories, and her presence in an unauthorized location at a time where no other activities were being conducted in the area).

[13] Although lower federal court decisions may be persuasive, they are not binding on state courts. *Abela v General Motors Corp*, 469 Mich 603, 606-607; 677 NW2d 325 (2004).

Extreme and persistent nervousness is generally entitled to more weight than general nervousness, *id.*, and a review court typically "examines specific indicia that the defendant's nervousness was extreme, rather than credit an officer's naked assertion." *Id.* at 1148; see, e.g., *Lewis*, 251 Mich App at 72 (increasing loss of color in the face and shaking hands)[14]; *People v Muro*, 197 Mich 745, 746; 496 NW2d 401 (1993) (cracking voice, avoidance of eye contact, twitching movements, rubbing arms and legs); *Simpson*, 609 F3d at 1148 (uncontrollable shaking); *United States v Sanchez*, 417 F3d 971, 973 (CA 8, 2005) (rigid posture, shaky voice, visibly pounding pulse); *United States v Santos*, 403 F3d 1120, 1127 (CA 10, 2005) (changing the topic; swallowing hard; licking one's lips, quivering lips, nervously stroking the top edge of the head liner of the patrol car).

In this case, none of the objective indicia of nervousness found by reviewing courts to support reasonable suspicion is present in the description of defendant's behavior at the traffic stop. Moore described defendant and Outlaw as "very quiet, sitting still, low in the seats," and as "very assured in their gestures," all qualities that a common-sense approach to interpreting human behavior would not interpret as indicative of nervousness, let alone extreme nervousness.[15] *People v Shabaz,* 424 Mich 42, 55; 378 NW2d 451 (1985), quoting *United States v Cortez*, 449 US 411, 418; 101 S Ct 690, 695; 66 L Ed 2d 621 (1981) (indicating that determining reasonable suspicion involves "common-sense conclusions about human behavior"). Moore characterized this behavior as "unusual," and the prosecution refers to it on appeal as "out of the ordinary." However, behavior that merely is "unusual" or "out of the ordinary" does not necessarily support a finding of reasonable suspicion. *United States v Townsend*, 305 F3d 537, 541-545 (CA 6, 2002) (concluding that the unusual gestures of defendant's raising his hands in the air when officer approached did not contribute to a finding of reasonable suspicion). Even assuming that behavior that could apply to a presumably innocent motorist is "unusual" or constitutes "nervousness," at no point does Moore explain how defendant's behavior contributed

---

[14] The facts substantiating a finding of reasonable, articulable suspicion in *Lewis* are far more compelling than those presented in the instant case. In *Lewis*, the defendant had taken a one-day round-trip flight from Detroit to Corpus Christi, a reputed source city for drugs. His stay in Corpus Christi lasted for around 12 hours, most of which was during the middle of the night. The defendant appeared nervous from the time he disembarked from the plane until he retrieved his luggage and began his trip back to Kalamazoo, and at a time when he did not know he was being watched by law enforcement pursuant to a tip. The defendant had more luggage than one would expect for the length of his stay, and he grew "extremely nervous" when stopped by the police for a traffic violation due to expired plates. He also lied about his travels. *Lewis*, 251 Mich App at 71-72. Defendant's extreme nervousness during the traffic stop "simply added to the officer's already reasonable suspicion." Id. at 74.

[15] If being "very quiet, sitting still, low in the seats" and "very assured" in one's gestures constitutes nervousness, as the prosecution proposes, as does "twitching movements," "shaking hands," "rubbing arms and legs," "uncontrollable shaking," "rigid posture," a "shaky voice," and a "cracking voice," as have been deemed signs of nervousness by reviewing courts, one questions how a person could ever be deemed not nervous. As a reviewing court, we do not credit an officer's naked assertions, but rather, specific indicia in the form of factual observations. See, *Simpson*, 609 F3d at 1148, which we find to be persuasive.

to the reasonable suspicion that defendant was "engaged in, or poised to commit, a criminal act *at that moment*." *Sokolow*, 490 US at 12 (MARSHALL, J., dissenting); see also *Brown v Texas*, 443 US 47, 51; 99 S Ct 2637; 61 L Ed 2d 357 (1979) (reiterating that, to detain a suspect, officers must "have a reasonable suspicion, based on objective facts, that the individual is involved in criminal activity"). Furthermore, Moore does not provide any factual information regarding how defendant acted before and after he informed defendant that he would only be issuing a verbal warning, rather than a citation, for the tinted windows. Review of the body camera video footage wherein Moore removes defendant and later Outlaw from the vehicle to further question and frisk them reveals no observable signs of nervousness in either individual. Thus, we attribute little significance to Moore's physical observations of defendant and Outlaw being "very quiet, sitting still, low in the seats," and "very assured in their gestures."

Criminal history, in conjunction with other factors that foster a reasonable suspicion of current criminal activity, can contribute "powerfully to the reasonable suspicion calculus[,]" *Simpson*, 609 F3d at 1148, and the trial court found that Moore's contention that defendant or Outlaw "may have a history related to trafficking narcotics" to weigh strongly in favor of a finding of reasonable suspicion. However, criminal history alone is insufficient to give rise to the requisite reasonable suspicion to prolong a traffic stop. *United States v Sandoval*, 29 F3d 537, 542 (CA 10, 1994). "Even people with prior convictions retain Fourth Amendment rights; they are not roving targets for warrantless searches." *Santos*, 403 F3d at 1132.

In this case, although defendant did have a criminal history at the time of the traffic stop, Moore's testimony at the suppression hearing was not that defendant's or Outlaw's prior criminal history "related to trafficking narcotics." Moore testified that there was an "officer safety precaution" out on defendant, which prompted him to investigate defendant's criminal history further. The trooper summarized the information he obtained as "narcotics and also possibly another agency might be looking at [him] for the same activity." Nothing in the record indicates that defendant's prior criminal history includes recent drug-related charges, or relates specifically to trafficking narcotics. For purposes of sentencing as a habitual offender under MCL 769.12, the charging document reports that defendant was convicted for possession of less than 25 grams of cocaine, MCL 333.7403(2)(a)(*v*), in 1992 and in 1995. Although the relevance of a suspect's criminal history to a determination of reasonable suspicion is not limited to recent or to similar convictions, whether defendant's criminal history contributes to a finding of reasonable suspicion does depend on the existence of other factors that give rise to reasonable suspicion. *Sandoval*, 29 F3d at 542. Thus, the relevant inquiry is whether other factors exist that foster reasonable suspicion of current criminal activity and allow consideration of defendant's criminal history to contribute to the "reasonable suspicion calculus." See *Simpson*, 609 F3d at 1148.

Moore also supported his decision to prolong the traffic stop by calling attention to defendant's allegedly inconsistent responses to the trooper's question regarding where defendant was coming from.[16] See *United States v Brigham*, 382 F3d 500, 509 (CA 5, 2004) (explaining

---

[16] In its brief in opposition to defendant's motion to suppress, the prosecution stated that Moore made his decision to conduct a canine sniff after obtaining conflicting accounts of defendant's travel plans from Outlaw. However, the body-camera video of the traffic stop clearly shows

that inconsistent statements about travel plans was one of the factors considered when determining whether law enforcement actions and detention were reasonable). Typically, legally significant inconsistencies derive from clearly untruthful statements or from statements that are highly implausible. See, e.g., *Williams*, 472 Mich at 311 (the defendant stated during a traffic stop for speeding that he was going to Cheboygan to visit friends and that he was planning to stay at the Holiday Inn, but Cheboygan did not have a Holiday Inn. He also stated that he would be staying for two days, but admitted he had no luggage. The other occupants in the car gave inconsistent responses about their own travel plans); *Lewis*, 251 Mich App at 72 (knowing defendant's itinerary, officers knew that defendant was being untruthful about his travels); *Goss*, 852 F Supp 2d 871, 886 (CA 6, 2012) (finding highly suspect that defendant did not know that the basketball team he drove 1200 miles to support in the NCAA Final Four Championship actually advanced to the finals). Statements about travels that are unusual or strange because they represent a choice that the typical person or law enforcement officer would not make typically contributed minimally if at all to reasonable suspicion. See, e.g., *Townsend*, 305 F3d at 542-543 (finding insufficient to support a finding of reasonable suspicion the driver's inability to remember his relative's address and the fact that he would arrive at his relative's between 4 and 5 a.m.); *Simpson*, 609 F3d at 1152 (rejecting the argument that defendant's driving a long distance to spend one night with his friend in Reno, and gambling at his friend's house instead of going to a casino were suspicious, given that both were reasonable choices). Here, Moore testified that defendant first said he had dropped a relative off at the casino to work, and later confirmed that he had dropped his aunt off at the casino, but upon further questioning he stated that she was not employed by the casino, she was there to gamble. Arguably some people might view gambling as a form of income generation, which is why people gamble. Although Moore took defendant's concession that his aunt was not employed at the casino as an inconsistent story, it does not rise to the level of inconsistency so as to be deemed clearly untruthful or highly implausible. Defendant's stated point of origin never changed, and in fact, his cousin Outlaw later confirmed defendant's explanation. If such alleged inconsistency contributes to the reasonable suspicion analysis at all, it does so minimally.

The two remaining factors Moore claimed to rely on were defendant's driving a car registered to someone who was not present when he pulled the car over for the traffic stop, and the car's emitting a "strong odor of a masking scent." Both of these, when combined with other factors, can contribute to a finding of reasonable suspicion. See, e.g., *United States v Smith*, 601 F3d 530, 542 (CA 6, 2010) (where driving a car owned by an absent third party was one among several factors contributing to reasonable suspicion); *United States v Ludwig*, 641 F3d 1243, 1248 (CA 10, 2011) (where an overpowering smell of cologne commonly used to mask the odor of drugs was one among several factors contributing to a reasonable suspicion). However, with regard to the latter, the record evidence is mixed; Moore's descriptive statements at the scene

otherwise. Moore asked defendant for consent to search the vehicle and, upon defendant's refusal, Moore informed defendant that he was going to order a canine sniff before ever asking Outlaw to exit the car for questioning. Therefore, inconsistencies pertinent to a reasonable suspicion analysis came in response to the trooper's questioning of defendant. Moreover, Outlaw's explanation about their travel plans was similar to defendant's explanations. And it was Moore who assumed the car was defendant's aunt's vehicle, defendant made no conflicting statement to Outlaw's description of the car's owner.

contradict representations he later made in his written report and at the suppression hearing. Although Moore initially claimed at the suppression hearing that a strong, overwhelming masking odor was one of the factors he relied on to prolong the traffic stop with a canine sniff, he admitted on cross-examination that his written report only stated that the car's interior was well kept and had a fresh odor. On the body camera video, which Moore affirmed the accuracy of, Moore twice stated while searching the car's interior that it "*doesn't smell at all.*"

Both the video and Moore's testimony at the preliminary hearing clearly indicate that he decided to order a canine sniff because defendant refused to allow him to search the vehicle. "A refusal to consent to a search cannot itself form the basis for reasonable suspicion: 'it should go without saying that consideration of such refusal would violate the Fourth Amendment.' " *Santos*, 403 F3d at 1125, quoting *Wood*, 106 F3d 942, 946 (CA 10, 1997); see also *Florida v Bostick*, 501 US 429, 437; 111 S Ct 2382; 115 L Ed 2d 389 (1991) ("[R]efusal to cooperate, without more, does not furnish the minimal level of objective justification needed for a detention or seizure."). "If refusal of consent were a basis for reasonable suspicion, nothing would be left of Fourth Amendment protections. A motorist who consented to a search would be searched; and a motorist who refused consent could be searched, as well." *Santos*, 403 F3d at 1126. Consistent with United States Supreme Court precedent, the Eleventh Circuit Court of Appeals has held that "[t]he police cannot base their decision to prolong a traffic stop on the detainee's refusal to consent to a search. Such a refusal may only be considered when the police have already observed, before asking permission to search, facts sufficient to raise a reasonable suspicion." *United States v Boyce*, 351 F3d 1102, 1110 (CA 11, 2003). Thus, the question becomes whether the articulable facts that existed at the time Moore made his decision to seize defendant in order to conduct a canine sniff are in their totality sufficient to support a finding of reasonable suspicion that criminal activity was afoot. See *Townsend*, 305 F3d at 545.

At the time Moore made the decision to detain defendant and order a canine sniff, the following facts existed: defendant obliged the traffic stop and pulled over on the highway; defendant produced his driver's license and the car's registration upon request; Outlaw produced his driver's license upon request as a form of identification; defendant was sitting low in his seat, appeared quiet and still, and exhibited self-assured gestures, but no other observable signs of nervousness or anxiousness are indicated in the record; a LEIN check revealed that defendant's driver's license was valid; neither defendant nor Outlaw had any warrants for their arrest; the LEIN check revealed an officer safety precaution, which upon further investigation was determined to be a prior criminal history of narcotics and "possibly" another agency "might" be looking into them for the same activity; the car belonged to a third party, but it was properly registered and had not been reported missing or stolen; the interior of the car was well kept and either did not smell at all or had a fresh odor; defendant was instructed to exit the car and he did so; defendant was instructed to walk to the back of the car and he did so; defendant was asked whether he was in possession of anything that Moore should be worried about, such as weapons, and defendant indicated that he was not; Moore asked if he could search defendant and defendant consented willingly, raising his arms and allowing Moore to frisk him; Moore found no guns, drugs, or other contraband on defendant's possession; defendant twice explained his point of origin and his destination, and only altered or further clarified the reason why he was dropping his aunt off at the casino; Moore asked defendant whether he had been in prison at one time and defendant answered honestly that he had been and explained why he had been in prison; Moore asked if he had any firearms in the car, and defendant stated that he did not; defendant again

explained how he knew Outlaw, and that they were cousins; Moore asked defendant whether there was anything illegal in the car, such as narcotics or weapons, and defendant said there was nothing in the car. Moore again confirmed with defendant that he was dropping off his aunt and heading home. These are the facts upon which the existence of articulable reasonable suspicion to detain due to the suspicion of criminal activity being afoot must be discerned.

Accepting as true the facts provided above, and given our de novo review of the trial court's ultimate ruling on defendant's motion to suppress, we conclude that the totality of the circumstances did not rise to the level of reasonable suspicion supported by articulable facts. Something more than an inchoate or unparticularized suspicion or "hunch" is required in the form of particularized facts, *Champion*, 452 Mich at 98, in order to protect an individual's Constitutional shield against unreasonable seizures, *Rodriguez*, 135 S Ct at 1614. Here, while there are whisps of information that might cause Moore to wonder whether defendant, who had engaged in criminal activity in the past, might have decided to engage in some kind of criminal activity in the future, the totality of the information gleaned by Moore amounted to nothing more than rank speculation, and served more to resolve any suspicions raised than to aggravate them. And because defendant's decision not to consent to a voluntary search of the car despite Moore's repeated requests to do so cannot serve as a basis for reasonable suspicion, Moore's own admitted pivotal, tipping point in the investigation is legally invalid. See *Bostick*, 501 US at 437. As noted in *Santos*, 403 F3d at 1132, even people with prior convictions retain Fourth Amendment rights, and they are not roving targets for warrantless searches. This Court will not condone illegal searches based on intuition, a hunch, a gut feeling, "strange vibes," or other irrelevant and improper characteristics rather than sufficient articulable facts, and the ultimate discovery of contraband did not serve to validate the illegal search and seizure in this case. See *LoCicero* (*After Remand*), 453 Mich at 501. Thus, we reverse the trial court's order denying defendant's motion to suppress and remand for further proceedings.

Reversed and remanded for further proceedings consistent with this opinion. We do not retain jurisdiction. Given our disposition of this issue, we need not address the question of whether the canine sniff involving a car door that appears to have been left open by Moore was lawfully conducted.

/s/ Joel P. Hoekstra
/s/ Jane M. Beckering